URBANATIONAL DEVELOPERS, INC., MILLER VILLAGE ASSOCIATES, A LIMITED PARTNERSHIP, APRIL CONSTRUCTION CO., INC., AND UNITED STATES FIDELITY AND GUARANTY, CO. *v.* SHAMROCK ENGINEERING, INC.

[No. 3-475A71. Filed February 9, 1978. Rehearing denied March 20, 1978. Transfer denied May 26, 1978.]

*James A. Holcomb, Robert F. Peters, Lucas, Clifford, Kane & Holcomb,* of Merrillville, for appellants.

*William I. Marlatt, Marlatt & Kappos,* of Merrillville, for appellee.

HOFFMAN, J.—Defendants-appellants Urbanational Developers, Inc.; April Construction Co., Inc; Miller Village Associates; and United States Fidelity and Guaranty Company appeal from an adverse judgment on a construction contract and the foreclosure of a mechanic's lien.

Urbanational Developers, Inc. (Urbanational) is an Illinois corporation wholly owned by April Construction Co., Inc. (April). Urbanational's purpose is to act as a general contractor on various Federal Housing Administration (FHA) projects so that April could obtain a profit on work it performed itself. Morris Kalish is the President of both Urbanational and April, as well as the sole general partner of Miller Village Associates. Miller Village Associates is a limited partnership organized for the purpose of owning and investing in real estate and is owner of the Miller Village Apartment complex located in Gary, Indiana.

On August 1, 1970, Urbanational entered into a construction contract with Miller Village Associates (sometimes referred to as "Owner") whereby Urbanational was to act as general contractor for the construction of the Miller Village Apartment complex in Gary, Indiana. Also, on August 1, 1970, Urbanational and Miller Village Associates executed a "No-Lien Agreement" in which the general contractor waived the rights of itself, subcontractors, and materialmen to file mechanic's liens for work performed and materials supplied by them upon the Owner's property.

On August 13, 1970, Urbanational entered into a subcontract with Shamrock Engineering, Inc. (Shamrock) in which Shamrock agreed to perform certain site preparation, foundation preparation and sewer work on the Miller Village Project.

Periodic progress payments were made to Shamrock under the subcontract. However, a dispute arose between the parties as to various items of credit and of additional compensation, and accordingly, Urbanational withheld further payment. Shamrock's action sought recovery of the balance due under the contract, the value of certain additional work performed by Shamrock, and foreclosure of its mechanic's lien on the real estate involved. United States Fidelity and Guaranty was surety on the payment bond posted by Urbanational.

Trial to the court resulted in a judgment against appellants in the sum of $16,987.48, plus prejudgment interest from August 18, 1971, to the date of judgment on June 7, 1973. The trial court further found that a valid no-lien agreement existed at the time of the execution of Shamrock's subcontract with Urbanational. Finally, the trial court found against Shamrock on its claim for punitive damages.

On August 3, 1973, Shamrock filed its motion to correct errors asserting, *inter alia*, the inadequacy of damages and the invalidity of the no-lien agreement. Upon the failure of the trial court to rule upon such motion within thirty days, the Supreme Court of Indiana appointed a successor judge on December 4, 1973. *See*, Indiana Rules of Procedure, Trial Rule 53.1(A). The successor judge ordered a transcript of the proceedings to be prepared. And, after hearing arguments on Shamrock's motion to correct errors, the successor judge amended the judgment by increasing the amount thereof to $43,557.36, plus prejudgment interest, by finding that Shamrock was entitled to foreclosure of its mechanic's lien, and by permitting the recovery of attorney's fees.

On January 6, 1975, appellants filed their motion to correct errors alleging, *inter alia*, that the amended judgment was contrary to law since the court failed to specify the general reasons for its

granting of corrective relief. *See,* Indiana Rules of Procedure, Trial Rule 59(E)(7).

The successor judge granted the motion to correct errors in this respect and modified the judgment by setting out his reasons for granting corrective relief.

On February 20, 1975, appellants filed their petition to require Shamrock to make an election as to whether it would hold the undisclosed principal (Miller Village Associates) or the agent (Urbanational) liable for judgment. On February 24, 1975, appellants filed their second motion to correct errors. Both motions were subsequently denied and this appeal follows.

The issues presented on appeal concern the role of a successor judge who did not preside at the trial of the case to rule upon a motion to correct errors and whether the successor judge erred in awarding judgment for "extras" under the construction contract, in awarding prejudgment interest on the "extras", in entering judgment against April and Miller Village Associates who were not parties to Shamrock's subcontract with Urbanational, and in allowing foreclosure of Shamrock's mechanic's lien.

Before discussing the merits of the case at bar, it is necessary to dispose of Shamrock's contention that appellants have waived any consideration of the issues by failing to specifically set forth in their brief each error assigned in their motion to correct errors that appellants intend to raise on appeal. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7). However, appellants' summary of argument states that the several specifications of error in its motion to correct errors were consolidated into five separate categories of error. And, as in *Ind. S. Bd. of Tax Com'rs. v. Lyon & Greenleaf Co.* (1977), 172 Ind. App. 272, 359 N.E.2d 931 (transfer denied), each section of argument contains numerical reference to the specifications of error in the motion to correct errors relating to each section of argument. In the case at bar, however, some of the sections of argument contain such numerical references in the concluding paragraphs of the argument rather than as a preface to the argu-

ment. Although the noncompliance in the case at bar is not so substantial as to interfere with a rational consideration of the issues, appellate counsel should always make a good faith effort to diligently comply with the letter of the rules. *Murphy, Admx. v. Ind. Harbor Belt R.R. Co.* (1972), 152 Ind. App. 455, 284 N.E.2d 84. To do otherwise is to take a chance which could be easily avoided.

Appellants first contention is that a special judge who did not preside at trial may not weigh evidence and determine the credibility of witnesses when ruling upon a motion to correct errors. Before the adoption of Trial Rule 53.1, *supra*, the appropriate remedy when a trial judge failed to rule upon a motion for new trial was a writ of mandate. *Lies v. Ortho Pharmaceutical Corporation* (1972), Ind.,[1] 284 N.E.2d 792, order modified in part, 259 Ind. 192, 286 N.E.2d 170; *State ex rel. Harlan v. Municipal Court* (1943), 221 Ind. 12, 46 N.E.2d 198. Under the provisions of Trial Rule 53.1, *supra*, however, the failure of the trial judge to rule upon a motion to correct errors is remedied by the Indiana Supreme Court's appointment of a successor judge to decide the matter. In such instances, Trial Rule 53.1 is to be read in conjunction with Indiana Rules of Procedure, Trial 63(A), which provides, in pertinent part, as follows:

"If the judge before whom the trial or hearing was held is not available by reason of death, sickness, absence or unwillingness to act, then any other judge regularly sitting in the judicial circuit or assigned to the cause may perform any of the duties to be performed by the court after the verdict is returned or the findings or decision of the court is filed; but if he is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial or new hearing, in whole or in part."

This rule provides that a successor judge may in his discretion perform any of the duties that may have been performed by the regular trial judge. A problem arises, however, in those instances where the successor judge is confronted with issues involving the trial judge's familiarity with the evidence. Often the problem can

---

1. Not reported in Indiana Reports.

be resolved by the procurement and examination of a transcript of evidence by the successor judge. *See, Baker v. American Metal Climax, Inc.* (1976), 168 Ind. App. 445, 344 N.E.2d 73, 82 (transfer denied); *Lies v. Ortho Pharmaceutical Corporation, supra.* Nevertheless there remain instances in which the successor judge's failure to preside at trial renders him ill-equipped to perform the functions of the regular trial judge. One of these instances occurs when he is confronted with an issue which requires for its resolution a determination of the credibility of witnesses or the weight to be accorded certain evidence. Thus, Trial Rule 63(A) confers "discretion" upon the successor judge to grant a new trial or new hearing, in whole or in part, when he is satisfied that he cannot perform the duties of the regular judge because he did not preside at the trial.

The term "discretion" implies flexibility in light of varying circumstances. It is a privilege allowed a judge within the confines of justice to decide and act in accordance with what is fair and equitable. The exercise of discretion is reviewable only for an abuse thereof. *Preuss v. McWilliams* (1967), 141 Ind. App. 602, 230 N.E.2d 789.

> "An abuse of discretion is an erroneous conclusion and judgment, one clearly against the logic and effect of the facts and circumstances before the Court or the reasonable, probable and actual deductions to be drawn therefrom." *Dunbar v. Dunbar, et al.* (1969), 145 Ind. App. 479, 251 N.E.2d 468.

When a successor judge attempts to resolve questions of credibility and weight of evidence without having had an opportunity to hear the evidence and observe the demeanor of witnesses, he is depriving a party of an essential element of the trial process. Such an undertaking by the successor judge is against the logic and effect of the facts and circumstances before the court and amounts to an abuse of discretion. *See, Ruggieri v. Beauregard* (1972), 110 R.I. 197, 291 A.2d 413; *See* also, 4 Harvey, Ind. Pract. — Rules of Civ. Proc., *Author's Comments* — 63.2, at 329-30 (1971). To hold otherwise would be to grant a power of review to the successor judge that is not even claimed by appellate courts.

Appellants contend that the successor judge committed such an abuse of discretion in awarding recovery for certain "extras." These

items consisted of invoices for extra grading and extra excavation. Appellants contend that the work was merely required by the contract and that, assuming *arguendo* that the work was "extra", Shamrock failed to obtain a signed work order before commencing work as required by the contract. Shamrock contends that it was entitled to $9,110 for extra grading that was necessitated by changes in the elevations of various buildings. Shamrock further contends there was an oral modification of the contract in which Morris Kalish agreed to the extra compensation.

The evidence is uncontradicted that the elevations of certain buildings were changed during the course of construction. Ron Velo, an employee of Schipporeit Incorporated, Architects, performed the site engineering on the Miller Village Project and described how the changes in elevation came about. He testified that he was informed that the site was not balanced due to an excess amount of sand on the site. Accordingly, the elevations of the buildings were raised in order to alleviate the problem. Later, it was discovered that the elevations were too high, and consequently, certain buildings had to be lowered. The issue is whether these changes in elevations resulted in extra grading work to be performed by Shamrock.

The evidence presented by Shamrock discloses that they had completed rough grading and fine grading and were beginning "blue-topping" operations when they were informed by the job superintendent that the engineers were changing the elevations of the various structures. Additional changes of elevation occurred in September and necessitated the moving of an additional amount of dirt. These changes in elevation changed final grade and required Shamrock to perform almost all the work again.

Ron Marshall, a soils inspector employed by Salisbury Engineering, kept a daily report of the work with which he was involved on the Miller Village Project. Entries of August 27th and August 28th disclose that buildings A-1 and C-1 were cut to grade and that six compaction tests taken in building A-1 at elevation 630 were meeting the required specifications. An entry on August 31st indicated "fill continued building A-1 due to change in elevation 630

to 635." It was also disclosed that after building C-1 had been cut to grade, the final grade was changed from 635 to 645.

George Schipporeit, the architect who designed Miller Village Project, testified that "Building number 2" went down in elevation by one foot and that such a change would entail additional work in scraping off a foot from grade.

On the other hand, the evidence presented by appellants is to the effect the change of elevations did not require extra grading work for Shamrock, and that it was Shamrock who requested the changes. Morris Kalish testified that no extra work was performed by Shamrock and that the change in elevations resulted in less work than was required by the contract.

Ron Marshall and George Schipporeit stated that the changing of elevation may or may not cause extra work. Schipporeit stated that the changing of elevation was made to reflect the actual topography of the sand and thus result in a minimum movement of sand.

The inference to be drawn is that Shamrock requested this change of elevation to make its overall work on the job easier to perform.

In any event, the evidence is conflicting as to whether extra grading was performed by Shamrock and its resolution depends upon a weighing of evidence and a determination of the credibility of witnesses. The issue of Shamrock's failure to obtain a written work order likewise depends upon the weight and credibility of the evidence.

The General Contract, which was incorporated into the subcontract, provided that any changes in the work consisting of additions, deletions or other revisions must be authorized by written change order. Such change orders are generally considered valid and binding upon the parties. *Rebekah Assembly, etc., v. Pulse* (1910), 47 Ind. App. 466, 92 N.E. 1045, *reh. denied*, 47 Ind. App. 474, 94 N.E. 779 (1911). *See generally*, Annot., 2 A.L.R. 3d 620, § 3, at 631 (1965).

Kenneth Harrington, President of Shamrock, admitted that the extra grading was not done pursuant to written work orders.

However, Shamrock contends that a contract providing that any modification thereof must be in writing may nevertheless be orally modified, *Foltz v. Evans* (1943), 113 Ind. App. 596, 49 N.E.2d 358, or waived. *Oxford Devlp. Corp. et al. v. Ransauer Bldrs. et al.* (1973), 158 Ind. App. 622, 304 N.E.2d 211. *See generally*, Annot., 2 A.L.R. 3d 620, *supra*, § 19, at 648.

The evidence in the case at bar discloses that the written contract was added to by approximately 48 written change orders signed by the owner. However, the work deleted from the contract was verbally agreed upon. Moreover, there was an additional oral contract to do certain engineering work.

Kalish testified that he had not approved any written change orders for additional grading and was not aware that anyone else in his organization had so authorized the grading.

However, Harrington testified that he approached Kalish and was assured that if the overall design was going to cause additional time and expense Kalish would "take care of it." Harrington further testified that Kalish agreed to compensate Shamrock for the extra work on a time plus material basis.

The daily log of Robert Andrew, one of Shamrock's engineers, disclosed that Andrew was informed by Kalish that there would be no additional payment for grading and compaction which Shamrock claimed was extra. However, Harrington stated that he went out to the site the next day to stop the job but that the equipment was immediately put back to work by Kalish and the Project Superintendent, Stanley Raskow, with the knowledge that they were to pay for the work.

Thus, there is a direct conflict as to whether Kalish agreed to compensate Shamrock for the grading. The successor judge erred when he attempted to resolve these questions which required for its resolution a determination of the weight and credibility of the evidence.

Appellants also contend that the evidence is in direct conflict as to whether Shamrock was entitled to compensation for extra

excavation work. The plans and specifications provide, in pertinent part, as follows:

"The excavated exterior footing grades shall be 3'-6" below grade and a compacted soil pressure of 3000 psi[2] should be attained by use of a vibratory compactor."

The plans also provided:

"*Authorized Additional Excavation*: If approved subgrade is not encountered at the elevations shown on the drawings, the Architect may direct the Contractor to excavate to a greater depth and backfill with properly placed and tested compacted fill. Payment for such additional work shall be in accordance with the established unit prices of the contract."

Shamrock contends that it was required to do extra excavation and compaction work on exterior footings.

Shamrock's evidence discloses that it was stopped by Stanley Raskow and informed the structural aspect of the 3-foot 6-inch cut was insufficient to sustain the dead load imposed upon it by the building, and that Shamrock would have to undercut another 3½ feet, backfill in one foot layers and compact each layer with a ten ton vibratory compactor.

Appellants assert that their evidence was in direct conflict. Morris Kalish testified there was no additional excavation other than what was required by the contract. It should be noted, however, that such a qualified statement rests upon Kalish's interpretation of what the contract required. Moreover, this does not necessarily mean that Shamrock would not be entitled to additional compensation under the provision authorizing additional excavation.

George Schipporeit testified that if the soil pressure was 3000 pounds per square foot at 3½ feet below grade the specifications would be satisfied and Shamrock need do nothing more. However, if the soil pressure was inadequate at that depth, Shamrock could either dig deeper and find adequate soil pressure or dig deeper, backfill and recompact the material to obtain the required pressure.

2. The architect who drew the plans testified that the soil pressure should have been 3000 pounds per square foot not 3000 pounds per square inch.

He further testified that 3½ feet was a minimum depth which everyone in the industry would know.

Schipporeit stated that the specifications were satisfied although not necessarily at 3½ feet below grade. He further stated that there was a procedure for adjusting price if there were excessive unforeseen circumstances.

Ron Marshall, the soils inspector, testified that on occasion Shamrock did excavate more than 3½ feet below grade for the exterior footings but that this was done when Shamrock did not reach the required compaction of 3000 pounds per square foot. However, Marshall did not consider this as extra work and didn't remember anyone from Shamrock stating it was extra work.

A summary of appellants' position is stated in their brief as follows:

"The real problem on compaction was that plaintiff was required to meet a 3,000 per square foot compaction under the exterior footings and 95% of maximum dry density on interior footings. Plaintiff according to its testimony only wanted to excavate 3' 6" below the grade of the ground for exterior footings and 6' below the ground for interior footings. These depths were the base of the footings. It was under these footings that compaction had to take place by lifting in and compacting sand. *In many instances the soil was not properly compacted at the 3' 6" level or the 6' level, and it was necessary for the excavator to go lower and place fill under the footings in lifts.* * * * The Plaintiff then was required to do two things under the specifications. First he had to excavate to a certain depth and in addition he had to force the soil to reach a certain compaction which could or could not require deeper excavation. The work necessary to reach proper compaction was clearly within the specifications." (Emphasis added)

The fallacy in appellants' position is that although Shamrock was required by the specifications to excavate exterior footings 3 feet 6 inches below grade *and* to reach a compacted soil pressure of 3000 pounds per square foot, this does not necessarily mean that Shamrock was not entitled to additional compensation under the contract. The contract expressly authorized additional compensation

if Shamrock was required to excavate to a greater depth because approved subgrade was not encountered at the elevations shown on the drawings.

Walter J. Foran, staff architect at Shipporeit, Inc., stated that this provision would entitle Shamrock to more compensation if the required compaction could not be obtained at the 3½ foot depth.

Thus, there is no conflict in the evidence which would require the successor judge to resolve credibilty or weight of the evidence. Shamrock excavated deeper than 3½ feet below grade only when necessary to reach the required compaction of soil. The contract itself expressly authorized additional compensation under such circumstances. Accordingly, the successor judge did not err in awarding compensation for extra excavation.

Appellants next contend that the successor judge erred in awarding prejudgment interest on the "extras." Prejudgment interest is primarily statutory in Indiana. Our statute allows prejudgment interest on both accounts stated and accounts closed.[3]

---

3. On August 18, 1971, the date from which prejudgment interest commenced to run in the case at bar, Ind. Stat. Ann. § 19-12-103 provided as follows:

"19-12-103 [9330]. On writings and accounts.—On money due on any instrument in writing, on an account stated, from the date of settlement, or an account closed, upon the day an itemized bill shall have been rendered and payment demanded, or on money had and received for the use of another and retained without his consent, interest shall be allowed at the rate of six dollars [$6.00] a year on one hundred dollars [$100]. [Acts 1879, ch. 24, § 3, p. 43.]"

However, this statute was repealed by Acts 1971, P.L. 366, § 10(1), at 1675, and replaced by Acts 1971, P.L. 366, § 10(5), at 1676, which provided as follows:

"(5) Interest at the rate of eight percent (8%) per annum shall be allowed:

(a) From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by this act;

(b) And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent."

The effective date of this Act was October 1, 1971. Acts 1971, P.L. 366, § 8, at 1673. Acts 1971, P.L. 366, § 10(5), at 1676, was omitted by amendment in Acts 1974, P.L. 115, § 1, at 468. For present law, see IC 1971, 24-4.6-1-103 (Burns Supp. 1976).

An account stated is defined as an agreement between parties that all items of account and the balance struck are correct, together with a promise, express or implied, to pay the balance. *Walsh v. Farm Bureau Co-op* (1969), 146 Ind. App. 42, 252 N.E.2d 609 (transfer denied); *Wiggam v. Rhodes' Estate* (1931), 92 Ind. App. 491, 176 N.E. 250; 1 I.L.E., Accounts and Accounting § 31, at 60. However, the agreement may be inferred from delivery of the statement coupled with the recipient's failure to object within a reasonable time. *Burns Construction, Inc. v. Valley Concrete* (1975), 163 Ind. App. 154, 322 N.E.2d 404. In the case at bar, the weight to be accorded the inference is conflicting. While there is testimony that there was no objection to the invoices until the job was coming to a close in April or May of 1971, there is nevertheless other testimony, although conflicting, denying that the amount for the "extras" was owed. And, once liability has been denied, failure to object does not convert the invoices into an account stated. *Walsh v. Farm Bureau Co-op, supra.* Moreover, the mere furnishing an account which was not given with the view to establishing a balance due or finally adjusting the matters between the parties does not constitute an account stated. 1 Am.Jur.2d, Accounts and Accounting, § 21, at 395. Thus, whether the invoices were intended to reflect the amount of work actually done and an agreement to pay or were mere estimates of amounts due is not without conflict.

The evidence does not permit recovery of interest on the theory of an account closed. An account closed is an account to which no further additions can be made on either side, but which remains open for adjustment and set-off. Black's Law Dictionary (4th Ed. 1968), at 34. Thus it differs from an account stated because there is no balance struck nor an agreement to pay the balance. *Bass v. Bass* (1829), 25 Mass. (8 Pick.) 187. In the case at bar, the items of any final billing would have been in controversy when the billing was sent.

An award of prejudgment interest is not governed solely by statute. In *New York, etc., R. Co. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468, our Supreme Court stated that the crucial factor in determining whether to allow interest before judgment is whether the

damages are complete and ascertainable as of a particular time in accordance with fixed rules of evidence and accepted standards of valuation.

In the case at bar, the contract provided that the compensation for additional excavation work necessitated by the failure to encounter approved subgrade at the elevations shown on the drawings would be in accordance with the established unit prices of the contract. However, Harrington testified that the compensation for the work was agreed to be on a time plus material basis.[4] In such case the cost of materials and labor as well as the amount of time labor performed must be determined. Yet the invoices sent by Shamrock stated only the total amount due rather than an itemized bill of the various items comprising the claim. Thus the amount due was not ascertainable under fixed rules of evidence or accepted standards of values *before trial. School Constr. Corp. v. A. V. Stackhouse Co.* (1972), 153 Ind. App. 366, 287 N.E.2d 564, 60 A.L.R. 3d 478 (transfer denied); *Lindenborg et ux. v. M & L Builders* (1973), 158 Ind. App. 311, 302 N.E.2d 816. *See generally,* Annot., 60 A.L.R. 3d 487 (1974).

Appellants next contend that the trial court erred in entering judgment against April Construction Company and Miller Village Associates when Shamrock contracted only with Urbanational Developers.[5] Appellants assert that Shamrock's complaint did not seek a personal judgment against April and Miller Village Associates, that the trial judge denied Shamrock's motion to amend the complaint to conform to the evidence made at the conclusion of all the evidence, and that accordingly the court erred in entering judgment against these two appellants.

If the complaint did not seek a personal judgment against April and Miller Village Associates, then there is an inconsistency between the order denying the motion to conform the pleadings to the evidence and the judgment. In construing orders, the record as a whole is considered, and where con-

---

4. Kalish disputes whether there was such an agreement.

5. It should be noted that the original judgment as well as the amended judgment were against April and Miller Village Associates.

flicts in the record cannot be harmonized, that construction is adopted which is just under all the circumstances, giving due reference to the place and character of the portion of the record where contradictory recitals appear. 56 Am.Jur.2d, Motions, Rules and Orders § 29, at 24.

In the case at bar, the motion to amend the complaint to conform to the evidence was made at the conclusion of all the evidence. *See*, Ind. Rules of Procedure, Trial Rule 15(B). The rationale underlying Trial Rule 15(B), *supra*, is to promote relief for a party based upon the evidence actually forthcoming at trial, notwithstanding the initial direction set by the pleadings. *Ayr-Way Stores, Inc. et al. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335. Our Supreme Court, at 93-94 of 261 Ind., at 340 of 300 N.E.2d quoted with approval *Indpls. Transit v. Williams, etc.* (1971), 148 Ind. App. 649, 269 N.E.2d 543, as follows:

> " 'Whether the "issues" to be tried in any law suit are formed by the pleadings or in a pre-trial order, their function is merely to provide the parties and the court with an itinerary for the journey through the trial. Either party may timely demand strict adherence to the pre-determined route or, if deviation is permitted, the time necessary to prepare to meet the new issue. *But when the trial has ended without objection as to the course it took, the evidence then controls.* Neither pleadings, pre-trial orders, or "theories" postulated by either party should then operate to frustrate the trier of fact in finding the facts which that evidence (including all reasonable inferences the trier may draw therefrom) convinces him (whether he be a judge or juror), by a preponderance thereof is true or block him from awarding the relief, if any, which the rules of substantive law say those facts merit.' " (Emphasis as appears in original.) 148 Ind. App. at 658-59, 269 N.E.2d at 550.

In interpreting the Federal Rules of Procedure, Fed. R. Civ. P., 15(b), which is identical to Trial Rule 15(B), it has been held to be error to deny a proper request for an amendment to conform to the evidence. 3 Moore's Federal Practice, ¶ 15.13[2], at 989-991. *See also,* 2 Harvey, Ind. Pract.—Rules of Civ. Proc., *Civil Code Study Commission Comments*—Rule 15(b), at 122 (1970).

Thus, if the evidence introduced at trial supports a theory of recovery against April and Miller Village Associates, then that evidence should control. And this is especially true when there is no objection to the evidence offered at trial. The complaint in the case at bar puts the defendants on notice that Shamrock was intending to offer proof to pierce the corporate veil of Urbanational. Thus, the trial court could implicitly rescind the order without resulting in prejudice to appellants.

The facts in the case at bar disclose that Urbanational Developers, Inc. is an Illinois Corporation formed in 1969 for the purpose of acting as a general contractor in various FHA projects. Urbanational is wholly owned by April Construction Company. According to FHA regulations, a general contractor could not make a profit for work it performed itself. Thus, by setting up Urbanational and subcontracting certain work to April Construction Company, April would be entitled to a 10% profit.

In addition to being owned by April, the officers of Urbanational are the same individuals who are officers of April. Morris Kalish is President of both Urbanational and April as well as the only general partner of Miller Village Associates.

The record further discloses that Urbanational's corporate books are blank. In August, 1970, Urbanational had no assets in either Indiana or Illinois, and had no employees in the payroll records. Kalish admitted that the only worth of Urbanational was to process papers. The processing of papers was done by Morris Kalish and Robert Rottenberg, Controller of April Construction and also an acountant of Urbanational. However, they received no wages from Urbanational for these services. Urbanational had no checking account, no equipment, no payroll records, no tax withholding, no workmen's compensation, no insurance, no employees, and did not file any State or Federal tax returns. Rottenberg testified that he did not file any tax returns for Urbanational because all its income and expenses were reported through April.

The fiction of the corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are

so conducted, as to make it a mere instrumentality or conduit of another corporation. *Burger Man, Inc. v. Jordan Paper Products, Inc.* (1976), 170 Ind. App. 295, 352 N.E.2d 821 (transfer denied); *Clarke Auto Co., Inc. v. Fyffe, etc.* (1954), 124 Ind. App. 222, 116 N.E.2d 532; *See generally*, Annot., 38 A.L.R. 3d 1102 (1971); 1 Fletcher Cye Corp., § 43, at 209 (Perm. Ed. 1974). The successor judge did not err in holding April liable on the contract. *Burger Man, Inc. v. Jordan Paper Products, Inc., supra.*

The "Miller Village Associates Limited Partnership Agreement" expressly provided that the party designated as general contractor (either April or Urbanational) would be the agent of the partnership and that all subcontracts entered into by the general contractor would be the contracts of the partnership. Miller Village Associates cannot now contend otherwise. The successor judge therefore did not err in holding April and Miller Village Associates liable on the judgment.

Appellants finally contend that the successor judge erred in finding that a recorded "No-Lien Agreement" was invalid and in ordering foreclosure of Shamrock's mechanic's lien. The original judgment entered by the judge who presided at trial found that a valid no-lien agreement existed at the time of the execution of Shamrock's subcontract with Urbanational.

The successor judge found that the " 'No-Lien Agreement' was executed subsequent to the construction contract between Urbanational Developers, Inc. and Miller Village Associates, a limited partnership, that there was no consideration given for the execution of said No-Lien Agreement and that said No-Lien Agreement is invalid and a nullity."

The successor judge further found that the "No-Lien Agreement" was invalid because there were not two independent contracting parties.

The evidence in the case at bar discloses that on August 1, 1970, Urbanational and Miller Village Associates entered into the standard FHA form of contract which provided that "[t]he Contractor shall file no mechanic's or materialmen's lien or maintain any claim

against the Owner's real estate or improvements for or on account of any work done, labor performed or materials furnished under this Contract."

Also, on August 1, 1970, Urbanational and Miller Village Associates entered into a "No-Lien Agreeement" in which the general contractor agreed that no liens would be filed against the real estate by the contractor or any employee, subcontractor, mechanic, journeymen, laborer or persons performing labor upon or furnishing material and/or machinery for such property.[6] Such agreement was recorded on August 3, 1970. The subcontract between Urbanational and Shamrock was executed on August 13, 1970.

A contract for the waiver of mechanic's liens, like other contracts, must be supported by consideration. *Ramsey v. Peoples Trust & Savings* (1970), 148 Ind. App. 167, 264 N.E.2d 111. Relying on *Ramsey*, appellants first assert that the "No-Lien Agreement" itself contains sufficient consideration for the waiver of a mechanic's lien by the general contractor because 1) the contract itself recites that mutual promises had been made, and 2) the contract gives a benefit to the owner by eliminating liens on the property and confers a detriment to the contractor who relinquished his lien rights.

---

6. IC 1971, 32-8-3-1 (Burns Code Ed.), provides, in pertinent part, as follows:

"No provision or stipulation in the contract of the owner and principal contractor that no lien shall attach to the real estate, building, structure or any other improvement of the owner shall be valid against subcontractors, mechanics, journeymen, laborers or persons performing labor upon or furnishing materials or machinery for such property or improvement of the owner, unless the contract containing such provision or stipulation shall be in writing, and shall contain specific reference, by legal description of the real estate to be improved and shall be acknowledged as provided in case of deeds and filed and recorded in the recorder's office of the county in which such real estate, building, structure or other improvement is situated not more than five [5] days after the date of execution of such contract. The contract herein provided for shall be without effect upon labor, material or machinery supplied prior to the time of the filing with the recorder of said contract. The recorder shall record such contract at length in the order of time of its reception in books provided by him for that purpose, and the recorder shall index the same in the name of the contractor and in the name of the owner, in books kept for that purpose, and said recorder shall receive therefor a fee such as is provided for the recording of deeds and mortgages in his office."

In *Ramsey* the waiver of lien contract contained a paragraph setting forth the consideration as follows:

" '2.  For and in consideration of the mutual promises contained in said separate agreement and herein and for the further consideration of one dollar ($1.00) and other good and valuable consideration the receipt of which is hereby acknowledged, the contractor does hereby waive and relinquish all right to a lien upon the real estate upon which the building is to be erected according to the terms of said specifications, plans and agreement.' "

In holding that the contract contained sufficient consideration, the court stated:

"The above paragraph clearly sets out as consideration mutual promises in addition to $1.00 and other good and valuable consideration. While the consideration of $1.00 and other good and valuable consideration may not be equivalent to the value of the waiver, sufficient consideration does exist in our opinion. It is not necessary that a consideration and a promise should be equivalent in actual value. *Knarr v. The Sand Creek Turnpike Co.* (1873), 45 Ind. 278."

In the case at bar, the "No-Lien Agreement" did not expressly incorporate the consideration supporting the general contract into the no-lien contract. The "No-Lien Agreement" provided that "in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows." The "premises" merely indicates the status of the parties as owner and general contractor and states their desire of entering into a no-lien contract. The "mutual covenants contained herein" consists of a promise by the contractor to waive his lien rights for himself and for his subcontractors, but it contains no return promise from the owner. In *Ramsey*, on the other hand, the waiver of lien contract itself provided "one dollar ($1.00) and other good and valuable consideration." This was sufficient consideration to support the promise in *Ramsey*.

Consideration consists of a bargained for exchange. To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee. *Trackwell, Admr., v. Irvin* (1917), 66 Ind. App. 5, 115 N.E. 807 (transfer denied). the contractor's promise in the case at bar conferred no

benefit on the promisor contractor nor imposed any detriment on the promisee owner.

Although the "No-Lien Agreement" did not expressly set forth a consideration, appellants rely upon a rule of contract construction to envelop the no-lien agreement with the consideration provided by the general contract. The rule relied upon is that in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject-matter are construed together in determining the contract. *Baker et al. v. Gordon et al.* (1960), 130 Ind. App. 585, 596, 164 N.E.2d 118; 6 I.L.E., *Contracts,* § 130, at 182; 17A C.J.S., *Contracts,* § 298, at 128. Thus, it has been said that the instruments need not each contain a separate mention of consideration, but that the consideration for one instrument may be found in the contemporaneous instrument. *Wellmore Builders, Inc. v. Wannier* (1958), 49 N.J. Super. 456, 140 A.2d 422, 426.

In the case at bar, the No-Lien Agreement specifically states that the parties have, on the same date, entered into a contract for the construction of an apartment complex. However, the general contract provided that the contractor should file no mechanic's or materialmen's lien. Such provision in the Standard Federal Housing Administration form contract has been construed to have been directed to statutes which permit the filing of a mechanic's lien only by the general contractor, rather than to statutes which also permit the lien to be filed independently by each subcontractor and materialman. *VNB Mortg. Corp. v. Lone Star Industries, Inc.*, (1974), 215 Va. 366, 209 S.E.2d 909, 75 A.L.R. 3d 497. Under such an interpretation, the language in the general contract is not itself sufficient to constitute a waiver of the subcontractor's mechanic's liens.

The separately executed "No-Lien Agreement" which extends the waiver to include subcontractors is more encompassing than the provision in the general contract. The rule of construing several writings executed in the course of the same transaction together should not be applied arbitrarily and without regard to the realities of the situation. 17A C.J.S., *Contracts,* § 298, *supra,* at 133. Moreover, the question of whether two instruments are part of the

same transaction must be determined by the facts of each particular case. 17A C.J.S., *Contracts,* § 298, *supra.* Thus there are several facts in the case at bar which would affect the weight of the inference.

The successor judge also held that the Miller Village Associates Limited Partnership Agreement resulted in a lack of two mutually independent parties. However, the agreement did not affect transactions between owner and general contractor. The identity of interest is a factor to be considered by the trier of fact in determining whether the aforementioned inference of construing several writings together would prevail.

The judgment of the trial court is affirmed with respect to the allowance of compensation for excavating and compaction and the liability of April and Miller Village Associates. The judgment is reversed for further proceedings not inconsistent with this opinion on the issues of compensation for extra grading, the allowance of prejudgment interest and the validity of the "No-Lien Agreement".

Affirmed in part; reversed in part.

Lowdermilk, J., participating by designation, concurs.

Staton, P.J. concurs in result.

NOTE—Reported at 372 N.E.2d 742.