**NORTHWEST CALF FARMS, INC.,**
**David Weaver, Jr., Appellants**
**(Defendants Below),**

v.

**Omer POIRIER, Appellee**
**(Plaintiff Below).**

**No. 3–1085–A–262.**

Court of Appeals of Indiana,
Third District.

Nov. 19, 1986.

Rehearing Denied Jan. 21, 1987.

Richard K. Muntz, Muntz & Vanderbeck, P.C., LaGrange, for appellants.

Bill D. Eberhard, Jr., Tim J. Cain, Eberhard & Cain, P.C., LaGrange, for appellee.

STATON, Presiding Judge.

Omer Poirier sued David Weaver, Jr., and Northwest Calf Farms (Northwest) on an account stated, alleging that Weaver had purchased cattle from Poirier as an agent for Northwest. Joint and several judgment was entered against Northwest and Weaver in the amount of $86,967, including prejudgment interest and $1,500 in attorney fees. The trial court awarded Poirier additional attorney fees in its order on the parties' motions to correct error. Northwest appeals, raising four issues, which we restate as follows:[1]

    I.  Was there sufficient evidence to support the trial court's findings of fact and conclusions of law?

   II.  Did the trial court err in basing its judgment on the theory of joint venture, which was raised for the first time in Poirier's post-trial brief?

 III.  Did the trial court err in basing judgment on a theory involving a violation of the Packers and Stockyards Act, 7 U.S.C. § 181 et. seq., because it was raised for the first time in Poirier's post-trial brief, and because the Act creates a specific statutory cause of action which Poirier did not pursue?

 IV.  Did the trial court err in awarding Poirier attorney fees based on an English statute, 17 Rich. II, c. 6 (1393)?

We affirm in part and reverse in part.

### I.

### *Sufficiency of Evidence*

Northwest challenges the sufficiency of the evidence to support the trial court's findings of fact and conclusions of law. When the trial court has entered special findings, we apply a two-tier standard of review. First, we must determine whether the evidence supports the findings, and then we must determine whether the findings support the judgment. *Keystone Square v. Marsh Supermarkets,*

---

1. In its motion to correct errors and its statement of the issues, Northwest sets out five issues, which it consolidates for argument as the four we set out above.

*Inc.* (1984), Ind.App., 459 N.E.2d 420, 422. Special findings will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Best v. Best* (1984), Ind. App., 470 N.E.2d 84, 86.

The facts most favorable to the judgment are as follows: Sometime in 1978, David Weaver, Jr., who had no license of his own to buy or sell cattle, entered an arrangement with Northwest under which he would be listed on Northwest's Indiana Cattle Dealers license, as well as on its federal license. Weaver displayed these licenses in his Topeka, Indiana office, received mail at this office in Northwest's name, and had invoices printed with Northwest's name on them. Northwest gave Weaver a corporate checkbook and authorized him to draft checks on its corporate account for the purchase of cattle. Weaver was to pay Northwest 35 percent of any profits from the sale of cattle purchased on Northwest's account.

In late 1978, Weaver negotiated with Poirier, a Canadian citizen, to purchase cattle from Poirier. Weaver represented to Poirier that he was acting under Northwest's license as its agent. Poirier had dealt with Weaver before this, but only when Weaver was selling under a valid dealer's license.[2] Before Poirier began selling cattle to Weaver in late 1978, he telephoned Robert Wassenaar, president of Northwest, to confirm that Weaver was acting as Northwest's agent and that Northwest would pay for cattle Poirier sold to Weaver. Wassenaar confirmed this.

Between late 1978 and September 1981, there were over 150 separate transactions between Poirier and Weaver. Weaver drafted checks on Northwest's account to pay for cattle bought from Poirier, and the checks were honored by Northwest's bank. Regardless of whether Weaver paid Poirier with his own personal check or a Northwest check, Poirier credited them to one account—Northwest's.

During this same period of time, Weaver and Poirier conducted two transactions in-

2. Weaver had his own license through 1974, and in early 1978 operated under the license of Cleo

dependently of Weaver's work for Northwest. On one occasion, Poirier shipped Weaver seven horses and took Weaver's personal checks in payment as Weaver sold the horses. On another occasion Poirier shipped Weaver 56 heifers, for which Weaver gave Poirier a personal note for $39,090.

In 1982, Northwest requested that Poirier prepare a statement of its account with him. Poirier prepared such a statement, on September 17, 1982, on invoices 534 and 535, and sent copies to both Northwest and Weaver. The statement reflected a balance due of $114,284.44, including $39,090 on the personal note Weaver had given Poirier. Neither Northwest or Weaver denied liability on the account until after this lawsuit was commenced, on January 12, 1983. At trial, no records were produced to prove that they had paid any part of the balance.

The trial court entered judgment against Weaver individually in the amount of $60,-400—principal plus prejudgment interest on the personal note he had given Poirier. It entered joint and several judgment against Northwest and Weaver in the amount of $86,967, for the remaining balance on the account, plus prejudgment interest and costs. Northwest was given a right of indemnity for any contribution it made over 35 percent of the judgment, and Weaver was given a similar right for any contribution over 65 percent.

The trial court based its initial judgment against Northwest on a joint venture theory, but in its order on the motions to correct errors, it modified its findings of fact and conclusions of law to support a theory of apparent authority, as well.

■ The *Restatement (Second) of Agency* § 8 defines apparent authority as follows:

> Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising

Lambright.

from and in accordance with the other's manifestations to such third persons. *See also Herald Telephone v. Fatouros* (1982), Ind.App., 431 N.E.2d 171, 175; *Stuteville v. Downing* (1979), Ind.App., 391 N.E.2d 629, 631. The belief of the third person must have a reasonable basis. *Stuteville, supra.*

■ The trial court found that Weaver operated under Northwest's Indiana and federal licenses to buy and sell cattle, and displayed these licenses in his Topeka, Indiana office. Before Poirier began selling cattle to Weaver, he telephoned Northwest to verify that Weaver was working as its agent, and Northwest's president, Robert Wassenaar, confirmed this. Weaver often paid for cattle Poirier sold to him with checks drawn on Northwest's account, which were honored by Northwest's bank. While Poirier did take a personal note from Weaver for 56 heifers, the trial court found that this transaction was independent from the nearly 150 other transactions in which it found that Weaver acted as Northwest's agent, with Poirier relying on Northwest as principal.

There is evidence to support these findings, and the findings in turn support the trial court's judgment. Because we find that the judgment is supported under a theory of apparent authority, we need not discuss the joint venture theory.

■ Northwest also challenges the trial court's finding of an account stated. An account stated has been defined by this court as "an agreement between parties that all items of account and the balance struck are correct, together with a promise, express or implied, to pay the balance." *Urbanational Developers, Inc. v. Shamrock Eng'g, Inc.* (1978), Ind.App., 372 N.E.2d 742, 750. The agreement may be inferred from failure to object within a reasonable time after receipt of the statement. *Id.; Burns Construction, Inc. v. Valley Concrete* (1975), Ind.App., 322 N.E.2d 404, 406.

■ The trial court found that Northwest requested that Poirier prepare a state-ment of its account reflecting the balance Poirier believed Northwest owed him. On September 17, 1982, Poirier prepared such a statement on invoices 534 and 535, sending a copy to Northwest. Northwest received a copy of the two invoices, and it had not denied liability on the account as stated when this lawsuit was commenced on January 12, 1983. Northwest offered no evidence that it had paid any part of the balance stated. These findings are not clearly erroneous, and they support the trial court's judgment on the account stated.

## II.

### Joint Venture

■ Northwest argues that the trial court erred in basing its judgment on a theory of joint venture, since that theory was not raised by Poirier until his post-trial brief. As we have discussed already, the trial court modified its findings of fact and conclusions of law to support a theory of apparent authority, as well. Even had the trial court based its judgment solely on the joint venture theory, Northwest's argument that this was improper because it was raised post-trial would not succeed. The theories of agency and joint venture are very closely related, with joint venturers deemed agents of one another. *Beck v. Indiana Surveying Co.* (1981), Ind.App., 429 N.E.2d 264, 267; Ind.Code 23–4–1–9. Thus, Northwest had adequate notice and opportunity to meet the issue of joint venture liability. *Beck, supra; see also* Ind. Rules of Procedure, Trial Rule 15(B).

## III.

### Packers and Stockyards Act

Northwest also argues that the trial court erred in basing its judgment on a theory involving a violation of the Packers and Stockyards Act, 7 U.S.C. § 181 et seq., because it was raised for the first time in Poirier's post-trial brief, and because the Act creates a specific statutory cause of action which Poirier chose not to pursue. Although the trial court mentioned the Act

in several of its findings of fact, it did not in fact base its judgment on a violation of the Act. In its finding that Northwest had not offered receipts or cancelled checks to show that it had paid any part of the account stated by Poirier, the trial court simply mentioned that Northwest had also failed to produce other records of payment required by the Act. Judgment was not based upon this latter failure as a violation of the Act, but rather upon the account stated and failure to pay.

## IV.

### Attorney Fees

■ The trial court awarded Poirier $1,500 in attorney fees at trial, and awarded him additional fees in its order on the motions to correct error. The trial court based its authority to make such an award on a British statute from 1393, 17 Rich. II, c. 6., which the court reasoned had been received as a part of Indiana law through our common law reception statute, I.C. 1–1–2–1(4).[3]

A similar argument, concerning the Statute of Gloucester (1287), was rejected by this court in *Hosts, Inc. v. Wells* (1982), Ind.App., 443 N.E.2d 319 (Staton, J., dissenting). In *Hosts*, Judge Garrard wrote that this argument ignores Indiana's long adherence to the general rule that in the absence of express agreement or special statute, a successful litigant is not entitled to attorney fees. *Id.* at 321. Judge Garrard noted that these cases were decided while the reception statute was in effect, and that the vitality principle of the common law, itself embodied in the reception statute, authorizes our courts to reject application of ancient common law principles and statutes otherwise received through the statute. *Id.* at 322.

We agree with Judge Garrard's reasoning in *Hosts*, and must conclude that our courts, through their adherence to the general rule regarding attorney fees, have rejected 17 Rich. II, c. 6 as a basis for awarding attorney fees, as well.

Even if 17 Rich. II, c. 6 had been received as a part of the common law of Indiana, it would not authorize an award of attorney fees in this case. The statute itself reads as follows:

> Item, *forasmuch as people be compelled to come before the King's council, or in the chancery, by writs grounded upon untrue suggestions;* That the chancellor for the time being, presently after that such suggestions be duly found and proved untrue, shall have power to ordain and award damages according to his discretion, to him which is so troubled unduly, as afore is said. (Emphasis in original).

The statute allowed the chancellor to award damages, including fees, against parties bringing unfounded and vexatious suits in chancery. *See Stallo v. Wagner* (2d Cir.1917), 245 F.636, 638.

Indiana courts have, in fact, recognized such an exception to the general rule on attorney fees—the obdurate behavior exception. In *Kikkert v. Krumm* (1985), Ind., 474 N.E.2d 503, 505, our supreme court wrote:

> The obdurate behavior exception only comes into play at the time a party files a knowingly baseless claim or at the time a party discovers that the claim is baseless and fails to dismiss it. Such conduct will constitute obdurate behavior if the trial court determines that it was vexatious and oppressive in the extreme and a blatant abuse of the judicial process.

■ This exception was intended to provide relief for defendants who are dragged into baseless litigation and cannot be extended to penalize a defendant merely on the basis that allegations in its plead-

---

**3.** The statute refers to "[t]he common law of England, and statutes of the British Parliament made in aid thereof prior to the fourth year of the reign of James the First [1607] (except the second section of the sixth chapter of forty-third Elizabeth, and the ninth chapter of thirty-sev-

enth Henry the Eighth,) and which are of a general nature, not local to that kingdom, and not inconsistent with [the U.S. and Indiana constitutions, Indiana statutes, and federal statutes]."

ings were found to be untrue, as the trial court did here. The trial court further attempted to ground its attorney fees award by pointing to Northwest's failure to keep certain records which are required under the Indiana Code and the Indiana Administrative Code. Even intentional and illegal conduct, occurring before the commencement of litigation, has been rejected as the basis for an award of attorney fees under the obdurate behavior exception. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 348. Under *Kikkert,* only a plaintiff's oppressive and vexatious filing of a baseless claim can support an award under this exception.

We reverse the trial court's award of attorney fees in its judgment and its order on the motions to correct errors, and we affirm the judgment in all other respects.

HOFFMAN and GARRARD, JJ., concur.