**B–DRY OWNERS ASSOCIATION,**
Appellant–Plaintiff,

v.

**B–DRY SYSTEM, INC.,**
Appellee–Defendant.

No. 49A02–9309–CV–506.

Court of Appeals of Indiana,
Second District.

June 23, 1994.

Rehearing Denied Aug. 17, 1994.

Philip A. Whistler, Curtis W. McCauley, Ice Miller Donadio & Ryan, Indianapolis, for appellant.

Terrence L. Brookie, Nelson D. Alexander, Locke Reynolds Boyd & Weisell, Indianapolis, for appellee.

FRIEDLANDER, Judge.

B–Dry Owners Association (the BDOA) appeals from a judgment of the Marion Superior Court awarding damages to the BDOA in its breach of contract action against B–Dry System, Inc. (the Company). The BDOA contends that the damages awarded by the trial court were inadequate. Upon appeal, the BDOA presents the following restated issues for our review.

I. Did the Company agree to contribute funds to the public relations program in exchange for the achievement of the previous year's sales performance by its franchisees, thus resulting, upon the achievement of the previous year's sales by the franchisees, in an enforceable obligation of the Company to fund the public relations program for the subsequent year?

II. Did the trial court err in calculating damages?

The relevant facts are not in dispute. The Company is a corporation which sells basement waterproofing franchises. The BDOA is a not-for-profit corporation comprised of several dozen of the Company's franchisees, also called licensees. In 1988, fifty-two of

the Company's sixty-two licensees were BDOA members.

In 1986, the BDOA initiated discussions with the Company regarding the need for a public relations (PR) program. In 1988, the BDOA and the Company began negotiations for the funding of a PR program. On December 6, 1988, the negotiations culminated in an agreement.

The parties agreed upon a PR program with a target cost of approximately $90,000 per year. The Company indicated it would not be able to pay the entire amount based upon sales and revenue from the previous year (1988). The Company indicated that it could pay $18,000 in 1989 based upon the 1988 total sales. In addition, the parties agreed upon a formula for computing the Company's share of the funding for an ongoing PR program. The parties agreed that the Company would pay $18,000 for sales totaling $16 million, and would pay an additional $18,000 for every one million dollars in sales above $16 million. Thus, for sales totalling $20 million, the Company would provide the entire funding for the $90,000 PR program. The Company's contribution for any given year would be based upon sales from the prior year. The formula also provided that these contributions would continue for each $1 million in sales above the $20 million.

The agreement was summarized in a December 15, 1988 memo which was sent to all franchisees. The franchisees were informed that the BDOA and the Company had selected LMS/Barrett Public Relations to provide the public relation services. It was agreed by the parties that any excess funds contributed to the "ongoing promotional campaign" would be spent as mutually agreed by the BDOA board members and the Company. No termination date for the program was identified in the December 15 memo or a January 9, 1989 market plan which described the arrangement and was distributed by the Company. There is no reference to a termination date in any memorandum comprising the agreement and it was not stated or fixed anywhere until the Company did in fact terminate the agreement, as set out below.

In 1989, the first year of the agreement, the Company contributed $18,000 and the BDOA raised approximately $36,000 from its members, which resulted in a total expenditure of $54,000 for the PR program. Near the end of 1989, the program experienced a shortage of funds and the BDOA advanced $7,000 of its money to cover the shortfall, all of which the Company subsequently reimbursed the BDOA from the Company's 1990 contribution.

Overall sales in 1989 increased to over $18 million. It was mutually determined that $60,000 would be spent for the PR program in 1990. Pursuant to the agreed-upon formula, the Company funded the entire PR program, without the need for contribution from the BDOA. On February 26, 1990, the Company signed an agreement awarding the PR contract to Anthony M. Franco, Inc. (Franco). Franco was awarded the contract after assuring the Company that it could conduct a quality PR program for $50,000. The Company paid the entire $50,000 to Franco and reimbursed the BDOA for the $7,000 it had spent in 1989. As a result, the Company in 1990 spent the approximate amount required by application of the formula.

In 1990, sales totalled in excess of $24 million. The Company contributed $131,-214.14 to the PR program fund. In addition to the regular PR campaign, a certain sum was used to fund special promotional projects agreed upon by the parties.

At a meeting between the Company and the BDOA in January of 1991, the parties discussed funding of the PR program for the coming year, which funding would be based upon the known 1990 sales which were in excess of $20 million. Joe Bevilacqua (Bevilacqua), the Company's president, asserted that the Company's contribution should be capped at $90,000, based upon the assertion that the agreement to pay $18,000 for each $1 million in sales above $20 million had been modified and agreed to by Don Henry, a former president of the BDOA. The BDOA disagreed that a modification had been made and produced a letter from Henry in which Henry denied the existence of any such modified agreement. After viewing the letter, Bevilacqua stated that he would "live up to

the agreement", *Record* at 559, and would apply the formula as originally agreed upon.

1991 sales exceeded $22 million and, pursuant to the formula, the Company's contribution was to be $133,377.76. On February 11, 1992, the Company through Bevilacqua unilaterally declared the agreement terminated, and refused to make any payment toward a 1992 PR program.

The BDOA brought suit against the Company for breach of contract, seeking damages in the amount of an alleged underpayment by the Company for the PR program in 1991 and 1992. The parties stipulated as to the applicable formula, the gross sales in 1990 and 1991, the Company's contribution amount arrived at through application of the formula, and the sums paid by the Company in the relevant years. Those stipulated figures are:

| Year | Sales | Amt. Due | Amt. Paid |
|------|-------|----------|-----------|
| 1990 | $24,500,859 | $171,015 | $131,124 |
| 1991 | $22,409,876 | $133,378 | 0 |

Following a bench trial, the court ruled in favor of the BDOA on the issue of liability. The court assessed the BDOA's damages at $6,750 plus costs. The BDOA appealed on the ground that the damage award of the court was inadequate.

Implicit in the trial court's judgment is its conclusion that the contract in question is an at-will contract. The BDOA expressly does not challenge this aspect of the judgment. Therefore, there is no question as to whether the Company breached the contract by unilaterally terminating the contract. It did not. *See House of Crane v. H. Fendrich, Inc.* (1970), 146 Ind.App. 478, 256 N.E.2d 578. The issue, rather, is whether the Company breached the contract in refusing to pay the 1992 contribution to the PR program based upon 1991 sales, and did it underpay the 1991 contribution based upon 1990 sales.

## I.

The BDOA argues that even pursuant to an at-will contractual agreement, a party may not be divested of rights which accrued prior to termination of the contract. Specifically, "[a] party to an at-will contract cannot avoid its liability to the other party, once that party has performed, simply by terminating

the contract." Appellant's Brief at 16 (citing *Wright Mfg. Corp. v. Scott* (1977), 172 Ind. App. 154, 360 N.E.2d 2). The Company counters that the Company's contributions to the PR fund were mere "unenforceable voluntary payments." Appellee's Brief at 15. The Company notes that, in the absence of consideration, a promise is merely an unenforceable gratuitous act, citing *Spickelmier Industries, Inc. v. Passander* (1977), 172 Ind. App. 49, 359 N.E.2d 563. There was no consideration to support the contract, contends the Company, because the Company's promise was not the product of a bargained-for exchange.

The BDOA's position is premised upon the argument that the BDOA had accrued a right to the Company's contribution prior to termination of the contract. Specifically, the BDOA contends that it had already "earned the right to this payment." Appellant's Brief at 15. This argument implicates the contractual doctrine of consideration, although in a way which differs from the argument advanced by the Company upon this issue. The two parties offer opposing viewpoints on the question of whether there was consideration to support the original contract. We agree with the BDOA that there was valid consideration to support the original agreement.

■ Consideration consists of a bargained-for exchange. *Wavetek Indiana, Inc. v. K.H. Gatewood Steel Co., Inc.* (1984), Ind.App., 458 N.E.2d 265. To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee. *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.* (1978), 175 Ind.App. 416, 372 N.E.2d 742. In the instant case, the BDOA agreed to provide funding for the PR program's first year in an amount representing the difference between the Company's contribution and total PR program costs, which amounted to $36,000. Moreover, the BDOA agreed to assume a significant part of the duties of administering the PR program, including appointment of a three-member panel of the BDOA members to oversee the program. The panel expended considerable time and expense in executing its duties in 1989, 1990, and 1991. The above constitutes

a detriment to the BDOA, i.e., the promisees, and thus supplies the consideration necessary to support the contract.

▪ The important question, however, is—what was the nature of the agreed-upon contract? The BDOA would characterize the bargained-for exchange as follows: The Company promised to make a contribution to the PR fund in a given year in exchange for sales compiled, in part, by members of the BDOA in the previous year, with the further understanding that the amount of the contribution was calculated using a formula which included sales for that previous year. Consistent with this line of reasoning, the BDOA offers *Tuthill Corp., Fill–Rite Div. v. Wolfe* (1983), Ind.App., 451 N.E.2d 72 for the proposition that the BDOA had already earned a contribution for 1992 when the Company terminated the contract.

In *Tuthill*, an employer had instituted a plan whereby key employees were paid a year-end bonus in an amount equal to one quarter of one percent of profits in excess of a specified level. Wolfe was one of the employees to whom the plan applied. In the middle of December, after several years of working under the bonus plan, Wolfe announced his intention to leave and enter into competition against the employer. Wolfe was immediately fired and the employer withheld Wolfe's bonus check. Wolfe brought suit, claiming that the employer could not withhold the bonus because it had already been earned. Our court of appeals agreed. The court's holding was premised upon the nature of the contract setting forth the terms of the bonus plan. The court noted that the plan was not contingent upon completion of a full year's work, thus payment could not be withheld upon that basis. The court's holding was premised upon it's conclusion as to the nature of the contractual agreement, as reflected in the program's purpose:

> "The very purpose of the ICP was to motivate key employees to increase productivity which would increase corporate profits thereby insuring those key employees a higher salary based on those improved profits. The plan worked; the profits improved." 451 N.E.2d at 75.

Therefore, in *Tuthill*, the court determined that the bargained-for exchange consisted of the employer's agreement to pay to key employees compensation based upon a percentage of their total sales over a specified amount in exchange for the increased performance.

The intent of the parties is the controlling factor in determining the nature of the agreement in question. *Peoples Federal Sav. and Loan Ass'n of East Chicago, Ind. v. Willsey* (1984), Ind.App., 466 N.E.2d 470. In the instant case, no instrument was prepared which memorialized the agreement between the Company and the BDOA. The record, however, contains materials which illuminate the parties' intentions, at the time the agreement was reached, regarding the terms of the contract.

The idea of a PR program originated and was pressed by the BDOA. The BDOA related its belief that the program was necessary to increase the public's awareness of the services offered by the Company and its franchisees, and thus ultimately to increase sales. Meetings were held at which the BDOA attempted to solicit financial contributions to a PR program from the Company. The Company eventually agreed to contribute to the program. Understood in this agreement was the BDOA's acquiescence to provide whatever funding was necessary to make up the difference between the Company's contribution and actual PR program costs. The Company and the BDOA agreed to share responsibility for management and oversight of the PR program. Finally, the parties agreed upon a formula for calculating the Company's contribution in a given year. Not surprisingly, the amount of the Company's contribution was made a function of the previous year's sales.

In sum, the PR venture was a mutual effort characterized by joint participation and joint responsibility. The program certainly cannot be described solely as an incentive program to increase sales on the part of BDOA members. Therefore, viewed as a whole, the contribution in a given year cannot be said to have been "in exchange" for services performed by the BDOA membership the previous year. The previous year's

sales merely provided a basis upon which to calculate the Company's contribution for the current year if it chose to participate in the PR program.

The agreement to participate in a national PR program was an at-will contract which could be terminated unilaterally by either party. In the Company's case, the initial decision to be made each year was whether to participate or to terminate the contract. Once it had decided to participate in the coming year, then it would calculate its contribution using the formula incorporating the previous year's sales. As such, each year was independent from the previous year with regard to each party's duty to perform under the contract. The prior year was relevant only in creating a basis to define the amount of the Company's contribution should it choose to renew its participation for the coming year. Therefore, when the Company terminated the contract following completion of the 1991 sales year, it had completely performed its obligations under the 1991 agreement and, in light of its termination, had no further PR program contractual obligations based upon anything which occurred during the 1991 sales year.

We note, however, that the Company did not terminate the contract until February 11, 1992. The Company's fiscal year commences on December 1 and ends on November 30. Therefore, prior to the termination of the contract, 73 days had elapsed in the 1992 sales year. We conclude that the contract was in effect until termination, and that the Company is therefore obligated to pay into the PR program its pro rata share of the entire amount due by application of the formula for the period beginning December 1, 1991 to February 11, 1992. That 73-day period is equal to 20% of the sales year. The parties stipulated that the Company's contribution to the PR program based upon 1991 sales, had it been obligated to pay the entire amount, would have been $133,378. Therefore, the Company is obligated to pay to the BDOA 20% of that amount, or $26,675.60.

## II.

The BDOA contends that the trial court erred in calculating damages. To the extent that this argument is premised upon the contention that the Company was obligated to pay more than a pro rata share for the portion of the 1992 sales year which elapsed prior to termination of the contract, it is rejected. However, the BDOA also contended at trial that the Company underpaid its obligation in 1991 based upon application of the formula to 1990 total sales.

Prior to trial, the Company and the BDOA jointly stipulated that "[f]or the purpose of funding the public relations program" 1990 total sales equaled $24,500,859.23, and the Company contributed $131,214.14 based upon those sales. Nevertheless, in its post-trial brief the Company claimed that the appropriate sales figure (termed "collected sales" by the company), for purposes of application of the formula, was actually $23,039,513.72. Although not explicitly so stated, it is apparent that the trial court used the lower figure set forth in the post trial brief in calculating the amount of the underpayment.

In offering evidence pertaining to to the lower figure, the Company sought to dispute a fact to which it had already stipulated. "A stipulation of facts is an express waiver made in court or preparatory to trial, by the party or his attorney, conceding for the purposes of the trial the truthfulness of some alleged fact. It has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted, so that the one party need offer no evidence to prove it and the other is not allowed to disprove it." *County Department of Public Welfare of White County v. Trustees of Indiana University* (1969), 145 Ind.App. 392, 251 N.E.2d 456, 461.

When a stipulation is offered in open court, both the court and the parties are bound by the stipulation. *Harlan v. Harlan* (1989), Ind.App., 544 N.E.2d 553, *aff'd*, (1990), Ind., 560 N.E.2d 1246. Generally, stipulations may not be withdrawn absent grounds such as fraud, mistake, undue influence, or grounds of a similar nature. *Id.* The Company cites nothing of record that supports the court setting aside the stipulation in

question upon such grounds. Therefore, the trial court erred in not using the stipulated 1990 total sales figure.

At trial, the Company contended that the amount it owed should be reduced by the percentage of national franchisees who were BDOA members. That is, the Company noted that at that time only half of its franchisees were BDOA members. Therefore, the Company reasoned, the BDOA should receive only fifty percent of the shortfall, if any. The trial court agreed with the Company's contention and reduced the BDOA's damage award accordingly.

We agree with the BDOA's assertion that there is no evidence that the Company's obligation was contingent upon the percentage of franchisees who were members of the BDOA. Moreover, the Company was fully aware in previous years that the BDOA's membership incorporated only a portion of its total franchisees, yet the Company paid the full amount due according to the formula. Therefore, the trial court erred in reducing the BDOA's award.

This cause is remanded to the trial court for recalculation of damages consistent with this opinion.

Judgment affirmed in part, reversed in part, and remanded.

KIRSCH and CHEZEM, JJ., concur.