WRIGHT MANUFACTURING CORPORATION AND WRIGHT TOOL & MANUFACTURING, INC. *v.* KEITH F. SCOTT, D/B/A K. F. SCOTT & ASSOCIATES.

[No. 1-1275A221. Filed February 14, 1977. Rehearing denied March 17, 1977. Transfer denied June 10, 1977.]

*Robert G. Elrod, French M. Elrod, Elrod & Elrod,* of Indianapolis, for appellant.

*Alan H. Lobley, Ice Miller Donadio & Ryan,* of Indianapolis, for appellee.

## STATEMENT OF CASE

LOWDERMILK, J.—Defendants-appellants, Wright Manufacturing Corp., and Wright Tool & Manufacturing, Inc. (Wright)

appeal from the judgment of the trial court which awarded plaintiff-appellee, Keith F. Scott, d/b/a K. F. Scott and Associates (Scott) $93,573.34 damages for breach of an oral agreement to pay commissions.

## FACTS

The facts necessary for our disposition of this appeal are as follows: In 1967, Scott and Wright entered into an oral agreement whereby Scott would procure business for Wright in exchange for a 5% commission on all orders he obtained. The parties made no provision concerning fees subsequent to the termination of their relationship. By letter dated November 24, 1970, Wright terminated Scott's agency effective December 31, 1970.

The trial court made findings of fact which provided in pertinent part as follows:

"Findings of Fact

"1. Plaintiff is a manufacturer's representative engaged in the business of selling various manufacturer's products to manufacturers of major appliances, such as refrigerators, ranges and home laundry equipment. The defendants are corporations organized and existing under the laws of the State of Indiana.

2. In 1967, Maurice Wright was doing business as Wright Tool & Die and was engaged primarily in the tool and die business, but did some roll forming of products. In 1967, the plaintiff and Maurice Wright made an oral agreement that Wright would pay the plaintiff five percent (5%) upon the amounts received by Wright from sales of manufactured goods whose orders were procured by the plaintiff. The plaintiff was to receive no commission on orders for tooling necessary to manufacture such products. Plaintiff was to service the customers he procured for Wright, and was to pay all of his expenses himself. Subsequently, Maurice Wright caused his business to be incorporated as the defendant corporations, and to the defendant corporations continued the same relationship with the plaintiff.

3. The sales which plaintiff obtained for the defendants were for metal trim on the major appliances of various manufacturers. The business with these manufacturers was done on an annual basis. The new models of appliances would generally come out in the fall of each year. In the summer

of each year, the manufacturers would issue blanket purchase orders for the coming model year, and as the year proceeded, amend these orders by what were called "releases," which specified what quantities were required at specific times. Sales under the original order would thus continue throughout the model year.

4. Plaintiff would call upon the various customers throughout the model year at intervals of three to four weeks. During these calls, he would inquire of the customer's buyers as to whether there were any problems or anything upon which he should follow up with the defendants. In this way, he would prevent small problems from becoming major irritations. He would also consult with the customers' designers who were working on the next model year and give them advice as to the problems and costs involved in proposed new trim. If the customers called plaintiff and wanted him to visit with respect to some question, as they did on many occasions, he would visit the customer, and if necessary, take along personnel from the defendants to discuss the problem which initiated the call. This calling upon the customers and the servicing of the customers with respect to orders already received, was for the purpose of maintaining good relationships throughout the product year so that the defendants could be in a good position to obtain business for the next product year. During these visits, plaintiff would entertain the customers' representatives, and on occasion, when they were in Indianapolis, would entertain them in Indianapolis. The defendants would not reimburse the plaintiff for his expenses in providing such services to the customer.

5. When the time for the orders for the new model year were to be obtained, the customers would generally submit their requests for quotations directly to the defendants. The defendants would then make a quotation and submit it to the customer with a copy to the plaintiff. Plaintiff would then follow up with the customer to see if the purchase order for the coming model year was to be issued to the defendants. In some instances, questions were raised by the customer with the plaintiff about the price quotation, and sometimes, at the customer's request, the defendants would requote in accordance with the customer's request in order to obtain the business. After the purchase orders for the coming year had been issued, the plaintiff would continue to service the account during the model year in order to procure the business for the following year.

6. After the purchase orders had been obtained from the customers for the 1970-71 model year, plaintiff continued to service the accounts for the defendants at his own time and expense, until the end of 1970. He ceased servicing these accounts because on November 24, 1970, the defendants terminated plaintiff's relationship by letter which read as follows:

'Please be advised that effective December 31, 1970, all arrangements or agreements between yourself and Wright Manufacturing Corporation and Wright Tool & Manufacturing, Inc., are terminated. . . .'

7. Thereafter, the defendants were able to prevail upon the principal customer, Midwest Manufacturing Corporation, to issue new purchase orders for the balance of the model year. Such purchase orders had never before been issued during the middle of a model year, nor have they been issued since. They were issued solely as a subterfuge to aid the defendants in avoiding the payment of commissions to the plaintiff.

\* \* \*

9. Plaintiff was the procuring cause for all of the business the defendants obtained from the following customers for 1970-1971 model year:

Midwest Manufacturing Corporation
Admiral Corporation, National Service Division
Fedders Corporation, Edison, New Jersey
Fedders Corporation, Greenville, Michigan
Franklin Manufacturing Co.
Frigidaire Division of General Motors Corp.
Canadian Admiral
Gibson Products Corporation
Kelvinator, Inc.
Tappan Company

"Plaintiff was also a procuring cause in obtaining the business from the same companies for the 1971-72 model years, to the extent that he continued to call upon and service at his own expense such customers after the purchase orders had been obtained for the 1970-71 model year. He continued to service such customers up until the end of 1970. However, by reason of the termination of the plaintiff by the defendants, plaintiff did not continue to serve these customers in anticipation of the orders for the 1971-72 model year after December 31, 1970.

10. Plaintiff was the procuring cause of the orders from Midwest Manufacturing Corporation for the 1970-71 model

year for the period following December 31, 1970, in the sum of Seven Hundred Forty-eight Thousand Eight Hundred Forty-eight Dollars Ninety-eight Cents ($748,848.98). For the same period of the same model year, he was the procuring cause of orders from Admiral Corporation, National Service Division, in the sum of Five Thousand Three Hundred Forty-one Dollars Forty-one Cents ($5,341.41); from Fedders Corporation, Edison, New Jersey, in the sum of Six Thousand Eighty-nine Dollars Forty-three Cents ($6,089.43); from Fedders Corporation, Greenville, Michigan, in the sum of Seventeen Thousand One Hundred Seventeen Dollars Forty-four Cents ($17,117.44); from Franklin Manufacturing Co. in the sum of One Thousand Six Hundred Fifty-three Dollars and Eighty-five Cents ($1,653.85); from Frigidaire Division of General Motors Corporation in the sum of Thirteen Thousand Ninety-six Dollars Four Cents ($13,096.04); from Canadian Admiral in the sum of Twenty-two Thousand Four Hundred Fifty-two Dollars Eighty-eight Cents ($22,452.88); from Gibson Products Corporation in the sum of Forty-six Thousand Sixty-six Dollars Seventeen Cents ($46,066.17); from Kelvinator, Inc. in the sum of Two Thousand Eight Hundred Twenty-two Dollars Eighty-five Cents ($2,822.85); and from Tappan Company in the sum of Thirteen Thousand Five Hundred Forty-five Dollars Fifty Cents ($13,545.50). The defendants paid no commissions on such sales. These sales total Eight Hundred Seventy-seven Thousand Thirty-four Dollars Fifty-five Cents ($877,034.55) on which plaintiff is entitled to a commission in the sum of Forty-three Thousand Eight Hundred Fifty-one Dollars Seventy-three Cents ($43,851.73).

11. Plaintiff, as one of the procuring causes of sales for the 1971-72 model year, is entitled to be paid his commissions on orders shipped for the 1971-72 model year through December 31, 1971. The defendants in such period shipped orders to Midwest Manufacturing Corporation in the sum of Four Hundred Seventy-seven Thousand Three Hundred Ninety-two Dollars Fifteen Cents ($477,392.15). In the same model year, plaintiff is entitled as one of the procuring causes of the sales to the following customers to receive his commission on the following sales through December 31, 1971 on the 1971-72 model year:

| Name | Amount of Sales |
|---|---|
| Admiral Corporation, Nat'l Service Division | $ 1,688.47 |
| Fedders Corporation, Edison, New Jersey | 990.15 |
| Fedders Corporation, Greenville, Michigan | 11,129.18 |
| Franklin Manufacturing Co. | 977.72 |
| Frigidaire Division of General Motors Corporation | 11,757.58 |
| Canadian Admiral | 13,495.07 |
| Gibson Products Corporation | 1,533.21 |
| Kelvinator, Inc. | 93.00 |

Plaintiff was not paid any commission on the above sales totalling Five Hundred Nineteen Thousand Thirty-six Dollars Fifty-three Cents ($519,036.53) and he is entitled to a commission of Twenty-five Thousand Nine Hundred Fifty-one Dollars Eighty-three Cents ($25,951.83) on such sales.

12. It is the custom and practice in the industry in whch the plaintiff and defendants were engaged to pay a manufacturer's representative one year's commissions when he is terminated and the contract contains no provision to the contrary.

13. Plaintiff is entitled to recover interest on the commissions qualifiedly tendered on April 2, 1971, in the amount of Six Thousand Two Hundred One Dollars Thirteen Cents ($6,201.13) at eight percent (8%) per annum from April 2, 1971. Plaintiff is entitled to recover interest at eight percent (8%) per annum on the balance of his commissions from December 31, 1971."

## ISSUES

1. Whether there was an agreement to pay Scott commissions subsequent to his termination of employment with Wright.

2. Whether the Statute of Frauds is a defense to Scott's claim.

3. Whether the trial court erred in admitting business records for the periods subsequent to Scott's termination.

4. Whether the trial court's judgment exhibits prejudice against Wright because of erroneously admitted evidence.

5. Whether the amount of the judgment is supported by sufficient evidence.

6. Whether Wright was denied a fair trial.

### DISCUSSION AND DECISION

*Issues One and Five*

Wright argues that because the parties herein were silent in their agreement concerning commissions to be paid Scott subsequent to his termination the trial court erred in awarding Scott damages representing commissions on goods sold after his termination by Wright.

Although Scott and Wright were silent in their oral argument as to commissions to be awarded Scott subsequent to his departure from Wright, nevertheless, we are of the opinion that there was substantial evidence of probative value to warrant the trial court in finding that Scott was entitled to commissions on some of the goods sold following his termination by Wright.

The record discloses that on direct examination Scott testified as follows:

"Q. All right did you have a discussion with Mr. Wright as to whether or not you were to receive any compensation if he obtained this business?

A. Mr. Wright and I did discuss it.

Q. And what was the substance of what you said and what he said about it?

A. I told him the first thing we we going to put over there if he wanted to take, to use me as a manufacter's [sic] re[p] on a 5% commission basis on any accounts that I brough[t] into him and on the basis of 5% I would pay my own expenses, entertaining, travelling and everythink [sic] else and this was agreeable with Mr. Wright, he said I hate sales and I know I'm not a salesman and he said you can handle the sales because I don't want to have anything to do with them."

Further, Wright gave the following testimony on cross-examination:

"Q. Okay and your agreement with Mr. Scott at the time you first made the agreement was to pay him 5% on the business he obtained for you wasn't that it?

A. He was to be paid 5% on the receipts less the whatever the tooling might be from the business he obtained.

Q. In other words when you say that the tooling contracts were separate contracts?

A. That's right and he wasn't to be paid on the tooling contracts.

Q. But he was to be paid 5% on the manufacturing part of the contract on the business he obtained is that basically it?

A. On the gross receipt.

Q. On the gross receipts?

A. Yes."

Therefore, it appears clear that the parties herein expressly agreed that Scott would be entitled to a 5% commission on the gross receipts from all manufacturing orders he obtained for Wright. The trial court found that Scott was responsible for procuring orders for Wright for the model years 1970-1971 and 1971-1972. The record discloses that Scott, *before* he was terminated by Wright, obtained from various customers blank purchase orders to run through the 1970-1971 model year. Therefore, we are of the opinion that Scott, pursuant to his oral agreement with Wright, is entitled to a 5% commission on orders Wright filled under its customers blank purchase orders representing the 1970-1971 model year. See, Finding of Fact No. 10, *supra*. Wright concedes that to the extent that Scott's recovery was based on occurrences prior to his termination—the law allows a recovery. Wright, however, insists that Scott's recovery was improper in the case at bar claiming (1) the evidence was insufficient to imply an agreement to pay commissions on parts not purchased prior to termination, and (2) there was no evidence that any parts shipped after January 1, 1971, was the result of any efforts by Scott.

As to Wright's first point, we have previously noted that the parties *expressly* agreed that Scott would receive a 5%

commission on orders he obtained for Wright. Therefore, Wright's arguments concerning *implied* terms in oral contracts falls wide of the mark.

Wright's second point is not borne out by the record as it relates to the 1970-1971 model year. The fact that Scott's employment with Wright was terminated before Wright's customers sent out all contract orders for the new model year, does not, *ipso facto*, prevent Scott from being the procuring cause of Wright's ultimately obtaining those contracts.

In *Wise* v. *Reeve Electronics, Inc.* (1960), 6 Cal. Rptr. 587, the Court therein at p. 590 stated the matter thusly:

> "In *Brea* v. *McGlashan*, 3 Cal. App.2d 454, at page 465, 39 P.2d 877, 882, the court in determining whether a finding that the plaintiff was the procuring cause of obtaining certain advertising contracts was sustained by the evidence, said: 'The word "procure" does not necessarily imply the formal consummation of an agreement. * * * In its broadest sense, the word means to prevail upon, induce or persuade "a person to do something. * * *"' The originating cause. which ultimately led to the conclusion of the transaction, is held to be the procuring cause.' To the same effect: *Rose* v. *Hunter*, 155 Cal. App.2d 319, 323, 317 P.2d 1027; *Willson* v. *Turner Resilient Floors*, 89 Cal. App.2d 589, 585, 201 P.2d 406; *Chamberlain* v. *Abeles*, 88 Cal. App.2d 291, 296, 198 P.2d 927. In the case last cited the court says, beginning 88 Cal. App.2d at page 296, 198 P.2d at page 930: 'Where the agent is the procuring cause of the transaction which he was authorized to negotiate' he is entitled to his commission irrespective of the fact that the principal himself, or through others, may have intervened and actually completed the final act of negotiation. Accordingly an agent who was the procuring cause of the transaction is entitled to his commission irrespective of the fact that it was consummated by the principal, that he was not personally present when it was entered into, that it was consummated without his knowledge, or that he did not personally see or talk to the other party entering into the transaction." (Citations omitted)

See, also, *Richer* v. *Khoury Bros., Inc.* (7th Cir. 1965), 341 F.2d 34.

The trial court also found that Scott was responsible for Wright's obtaining customer orders for the 1971-1972 model year, as represented by orders shipped by Wright through December 31, 1971. See, Finding of Fact No. 11.

We are of the opinion that the trial court's Finding of Fact No. 11 is clearly erroneous. *Citizens Gas & Coke Utility* v. *Wells* (1971), 150 Ind. App. 78, 275 N.E.2d 323. Unlike the situation above concerning the 1970-1971 model year orders, Scott's employment with Wright was terminated approximately 6 months *before* the 1971-1972 blank purchase orders were placed by Wright's customers. The trial court, at best, could only have speculated that Scott's continued service on the 1970-1971 model year accounts through December 31, 1970, in some way led to these customers placing orders in June or July of 1971, 6 months *after* Scott's termination, for the 1971-1972 model year. The fact that Scott continued to call upon and service customers at his own expense does not persuade us to reach a different result. Scott expressly agreed to assume this obligation in his oral contract with Wright. Also, our search of the record fails to disclose any testimony from Wright's customers that they were in any way motivated to issue Wright their blank purchase orders for the 1971-1972 model year in June or July of 1971, because of services performed by Scott between June and December, 1970. Even the trial court in its Finding of Fact No. 11 did not find that Scott himself was responsible for orders shipped by Wright for the 1971-1972 model year. Rather, the trial court found that Scott was *one of the procuring causes* for 1971-1972 model year sales.

Finally, even assuming that Scott's continued servicing of the 1970-1971 model year accounts could properly be considered the procuring cause of Wright's obtaining the 1971-1972 model year accounts, the trial court's Finding of Fact No. 11 would still be clearly erroneous as it reflects the amount of damages awarded Scott. The trial court assumed, without supportive evidence, that Scott's servicing some of the 1970-1971

model year accounts between June or July 1970, and December 31, 1970, was responsible for the very orders placed by these customers and filled by Wright for the corresponding period of the 1971-1972 model year as measured by Wright's sales invoices.

We are of the opinion that such extrapolation by the trial court in the computation of damages, although done in good faith, is speculative and clearly erroneous. *Daly* v. *Nau* (1975), 167 Ind. App. 541, 339 N.E.2d 71, 78; *Moore* v. *Waitt* (1973), 157 Ind. App. 1, 298 N.E.2d 456, 460.

Scott, in his brief, argues that the trial court's Finding of Fact No. 11 can be sustained by implying a business custom or usage to pay him commissions on sales for one year following his termination by Wright. See, Finding of Fact No. 12, *supra*.

In the case of *Morningstar* v. *Cunningham* (1887), 110 Ind. 328, 11 N.E. 593, 596, our Supreme Court stated the rule as follows:

". . . Where a usage in a particular trade or business *is known*, uniform, reasonable, and not contrary to law, or opposed to public policy, evidence of such usage may be considered in ascertaining the otherwise uncertain meaning of a contract, unless the proof of such usage contradicts the express terms of the agreement. This is so, even though the usage be that of a particular person, provided it be known to the parties concerned, or provided it has been so long continued, or has become so generally known and notorious in the place or neighborhood, as to justify the presumption that it must have been known to the parties. . . . Parties who are engaged in a particular trade or business, or persons accustomed to deal with those engaged in a particular business, may be presumed to have knowledge of the *uniform course of such business*. Its usages may therefore, in the absence of an agreement to the contrary, reasonably be supposed to have entered into and formed part of their contracts and understandings in relation to such business as ordinary incidents thereto . . ." (Our emphasis) (Citations omitted)

The record discloses that Scott gave the following testimony during direct examination:

"* * *

Q. Now in the course of serving as a manufacturer's representative do you consequently know other people who are in the same business?

A. Oh, yes, you get to know you[r] competitors and people who are sales representatives and I guess after 25 or 30 years I know a lot of them, yes sir.

Q. In the course of your pa[r]ticular service as a sales representative and knowing these various sales representatives have become familiar with what the practice in the industry is of when manufacture representatives are terminated, how they are paid on termination when they are working strictly on a commission basis paying their own expenses?

A. Well, yes, *I've known some instances.*

Q. Well, have you become familiar with what that practice is?

A. Well, the furture [future] practice is as far as I know—

Q. Not what the furture [future] practice is just what the practice is, just yes or no?

A. Yes.

Q. What is that particular practice?

MR. ELROD: Objection Your Honor I don't think he has been qualified as an expert in the business custom that he is about to ask him about.

THE COURT: Objection overruled.

MR. GOODWIN: And further objection Your Honor that he is asking him to testify to what other people have told him and by inference it is hearsay evidence.

THE COURT: Well, that might be true but I'm going to overrule the objection.

COUNSEL FOR DEFENDANT TAKES EXCEPTION.

Q. Is it the practice that they can terminate you for any reason?

A. Well, they can terminate it but they at least give you a year on it. (Our emphasis)

           *       *       *"

The record discloses, as can be seen from the above testimony, that Scott failed to prove the trade practice of awarding a manufacturer's representative commissions for a year following his termination was known by Wright, uniform and reasonable. Nor do we think that it would be proper to presume that Wright entered into the oral agreement with Scott with the knowledge of such a trade usage. Scott has failed to demonstrate that it was the "uniform or common" practice for manufacturers to pay their representatives commissions on orders filled for one full year subsequent to their termination. Scott testified that he knew only *some* instances of the trade practice of paying commissions to manufacturers representatives following their termination. *Morningstar* v. *Cunningham, supra,* at p. 596.

Therefore, we hold that the trial court's finding that Wright was to pay Scott a 5% commission on all orders that he was responsible for Wright obtaining, and that Scott was responsible for Wright's obtaining the orders specified in Finding of Fact No. 10 is not clearly erroneous. Ind. Rules of Procedure, Trial Rule 52(A): *Fisel* v. *Yoder* (1974), 162 Ind. App. 565, 320 N.E.2d 783. Further, the trial court's Finding of Fact No. 11 is clearly erroneous.

*Issue Two*

Wright argues that Scott's claim for commissions should fail because of IC 1971, 32-2-1-1 (Burns Code Ed.) which provides in pertinent part as follows:

"When contracts must be in writing.—No action shall be brought in any of the following cases:

           *       *       *

Fifth. Upon any agreement that is not to be performed within one [1] year from the making thereof; unless the prom-

ise, contract or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized; excepting, however, leases not exceeding the term of three [3] years. [1 R.S. 1852, ch. 42, Sec. 1, p. 299.]"

In *Purity Maid Products Co.* v. *American Bank & Trust Co.* (1938), 105 Ind. App. 541, 14 N.E.2d 755, 758, the general rule was stated as follows:

"Where no time is fixed for the performance of a contract; or where it is to be performed by a certain day (the right to perform it sooner not being precluded) ; or where the performance depends upon a contingency which may or may not happen within a year, the contract is not within Sec. 1 of the statute of frauds." (Citations omitted)

The oral agreement between Scott and Wright commenced in late 1966, or early 1967, and had no fixed date by which performance was to be completed. Also, the parties' performance was dependent upon a contingency which may have materialized within one year. Scott, for example, could have died within one year of the contract's formation. Therefore, we are of the opinion that the parties agreement does not violate the Statute of Frauds. *Durham* v. *Hiatt* (1891), 127 Ind. 514, 26 N.E. 401; *Stein* v. *Maldin Mills, Inc.* (1972), 9 Ill. App.3d 266, 292 N.E.2d 52.

*Issue Three*

Wright argues that the trial court erred in admitting over its objection Scott's Exhibits Nos. 10, 11, 12 and 13 on the ground that these exhibits were irrelevant for two reasons.

Scott's Exhibit No. 10 consisted of purchase orders dated January 1, 1971, from Midwest Manufacturing Corporation to Wright. Scott's exhibit No. 11 consisted of invoices from Wright to Midwest Manufacturing Corporation from January 1, 1971 to December 30, 1971. Scott's exhibit No. 12 consisted of invoices from Wright for the years 1970 and 1971 to Admiral Corporation, Canadian Admiral Corporation, Ltd., and Fedders Corporation; and Exhibit No. 13 consisted of invoices

for 1970 and 1971 to Frigidaire Div., General Motors Corporation, Gibson Products Corporation and Kelvinator, Inc.

Wright first argues that since Scott's employment was terminated effective December 31, 1970, the exhibits should have been excluded because there was no showing that Scott was responsible for obtaining the 1970-1971 and 1971-1972 model year accounts. We do not agree that there was no evidence tending to establish that Scott was responsible for obtaining Wright's 1970-1971 model year accounts. Scott's testimony, as reflected in the trial court's Findings of Fact Nos. 4 and 5, demonstrates that Scott was in fact a procuring cause of Wright's 1970-1971 model year sales. Wright further contends that the Exhibits should have been excluded because Scott presented no evidence which proved that he was *not paid* for accounts obtained subsequent to his termination. In response to this contention we note that "payment" is an affirmative defense which should have been pleaded and proven by Wright, not Scott. Ind. Rules of Procedure, Trial Rule 8(C).

We are of the opinion that Scott's Exhibits Nos. 10, 11, 12 and 13 were properly admitted as tending to demonstrate the proper measure of damages to which he was entitled. *Spears* v. *Aylor* (1974), 162 Ind. App. 340, 319 N.E.2d 639, 641.

*Issue Four*

Wright argues that the trial court erred in admitting, over objection, Wright's testimony during cross-examination as to the volume of his business for the years 1965 and 1966. We have noted in a previous part of this opinion that Wright was to pay Scott a 5% commission on all gross receipts he was responsible for obtaining for Wright. Evidence of sales volume before Scott's employment, measured against sales volume at the time of Scott's termination would, in our opinion, at least be some evidence of the damages which Scott had sustained. Even if the testimony could be viewed as being without probative value, we think any error in admitting the testimony must be considered harmless. TR. 61.

Wright argues that the trial court's Finding of Fact No. 7, *supra,* was without evidentiary support and therefore erroneous. Wright concedes in its brief that Scott testified that Midwest Manufacturing Company had never before issued new purchase orders for the balance of a model year. From this testimony, it would not be clearly erroneous for the trial court to infer that the purpose of this conduct was to avoid the necessity of paying Scott his commissions. On appeal, this Court will not weigh the evidence or judge the credibility of witnesses. Also, it will be noted that the trial court, independent of Finding of Fact No. 7, found that Scott was the procuring cause of Wright's 1970-1971 model year sales. See, Finding of Fact No. 10, *supra.* Therefore, regardless of what Wright did subsequent to Scott's termination, Scott's right to commissions was vested pursuant to his oral agreement with Wright at the time of his termination.

Wright's argument that the trial court erred by sustaining Scott's objection to testimony concerning the motives for his termination has been waived because of Wright's failure to make an offer of proof at the time the objection was sustained. *Gradison* v. *State* (1973), 260 Ind. 688, 300 N.E.2d 67, 80; *Christian Super Chevrolet Corp.* v. *State* (1976), 169 Ind. App. 143, 346 N.E.2d 602, 605.

Wright argues that the trial court's judgment is contrary to law because Scott's damages were computed without disclosing to it the method utilized in arriving at the amount of commissions due. Also, Wright contends that Scott's failure to disclose the basis for the computation or the evidence used to support it, has denied it due process of law.

The record discloses that Scott's commissions were based upon orders received by Wright, as reflected by Wright's sales invoices, through December 31, 1971. These figures were reflected by Scott's Exhibits Nos. 9, 10, 11, 12 and 13, which were offered and admitted into evidence. Wright stipulated that the Exhibits were authentic, but challenged their rele-

vancy. We have previously held that the documents were relevant and admissible. Therefore, we are of the opinion that Wright has not been denied due process of law.

It has been brought to the attention of this court that counsel for the appellee made mistakes in his computations when preparing Findings of Fact per order of the trial court. Therefore, we remand this case to the trial court to amend its Finding of Fact No. 10 and Decree to reflect the correct values of the orders Scott was found to have obtained for Wright for the 1970-1971 model years as reflected by Scott's Exhibits Nos. 9, 10, 11, 12 and 13, plus 8% legal interest thereon through the date of judgment. The trial court's Finding of Fact No. 11 is clearly erroneous, and Scott is to take nothing thereunder. As modified, the judgment of the trial court is affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 359 N.E.2d 2.