# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 03 2020, 8:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin M.L. Jones
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Stephen R. Snyder
Randall L. Morgan
Snyder Morgan Federoff &
Kuchmay LLP
Syracuse, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Department of
Natural Resources,

*Appellant-Defendant,*

v.

Webster Lake Conservation
Association, Inc.,

*Appellee-Plaintiff,*

September 3, 2020

Court of Appeals Case No.
19A-PL-2249

Appeal from the Kosciusko Circuit
Court

The Honorable Michael W. Reed,
Judge

Trial Court Cause No.
43C01-1902-PL-11

**Robb, Judge.**

# Case Summary and Issue

[1] In 1996, Webster Lake Conservation Association, Inc. (the "Association"), owner of a water control facility that was built to maintain the lake level of Webster Lake—an Indiana public freshwater lake—entered into an agreement with the Indiana Department of Natural Resources ("DNR") for the general maintenance, reconstruction, and repair of the water control facility located on the lake. A dispute arose between the parties as to DNR's responsibility for the reconstruction and repair of the water control facility, which led to the Association filing a complaint against DNR. The complaint sought a declaratory judgment as to the rights and obligations of DNR under the agreement. Following a hearing and additional briefing on the matter, the trial court entered a declaratory judgment in favor of the Association, finding that the agreement was a valid and binding agreement between the parties. DNR now appeals, arguing that the trial court erred in entering declaratory judgment in favor of the Association. Concluding the trial court did not err, we affirm.

# Facts and Procedural History

[2] Webster Lake is a public freshwater lake located in Kosciusko County. The legal lake level for Webster Lake was established in the 1950s. The Association, a corporation that was organized in 1950, is made up of the individuals living around the lake and owns the water control facility that dams the lake (the "Dam"). The Dam is controlled by a gated outlet structure which requires periodic operation of the gates to maintain the lake at its legally

established level. The Dam is nearly 200 years old and likely originated as a grist mill.

[3]     On April 11, 1996, DNR entered into an agreement (the "1996 Agreement") with the Association. John Simpson, then director of the Division of Water for DNR, executed the 1996 Agreement on behalf of the DNR.[1] The 1996 Agreement provides, in relevant part, as follows:

> THEREFORE, it is mutually agreed that:
>
>      1.     *The Association has the responsibility for the general maintenance of the outlet control structure* to maintain, as near as possible, the legally established level of Webster Lake. *The responsibility for reconstruction or repair of the outlet control structure shall remain with the Department of Natural Resources, State of Indiana.*
>
>      2.     The Association has the sole responsibility of maintaining Webster Lake as near as possible to the legally established average normal level in compliance with the Department's direction and guidance by:
>
> > a. Opening and closing the gates of the primary (eastern) control structure only according to the immediate conditions to maintain the level of the lake at [the legally established level].
> >
> > b. Keeping, at all times, the secondary (western) control structure closed, chained and locked, to be

---

[1] A similar agreement was executed in 1993, but that agreement is not at issue in this proceeding.

used as an operable structure only during an emergency and with prior authorization from the Department. Keys for the lock will be provided to the operator of the structure and the Division of Water, Department of Natural Resources.

c. Opening and closing the gate of the secondary (western) control structure, with prior authorization from the Department, at least once annually to keep the structure's gate from seizing.

d. Keeping on file with the Department at all times a current roster of the names, addresses and phone numbers of the designated operator and at least two alternate operators.

Appellant's Appendix, Volume 2 at 11 (emphasis added).

[4]     On October 30, 2009, DNR performed a visual inspection of the Dam. In its inspection report, the DNR rated parts of the Dam as being in "good" or "acceptable" condition, while other parts were rated "deficient[.]" *Id.* at 82-84. The overall condition of the Dam was found to be "Conditionally Poor[,]" and DNR recommended that the Association's "professional engineer, experienced in dam design and construction," evaluate the condition of the Dam and "direct repairs/replacement as needed." *Id.* at 84.[2] DNR further recommended that the Dam "be brought up to current dam design standards." *Id.*

---

[2] It is unclear from the record who, if anyone, served as the Association's professional engineer.

[5] In 2011 and 2012, DNR performed extensive rehabilitation work on the Dam—for example, DNR rebuilt portions of spillway[3] retaining walls, demolished a deteriorated fish ladder, and replaced portions of the catwalk and gates.[4] In 2013, DNR "completed a $420,000 repair project to the control structure spillway features" of the Dam.[5] *Id.* at 121.

[6] On October 12, 2017, DNR performed another visual inspection of the Dam and issued its inspection report on March 21, 2018. While parts of the Dam were rated as being in "acceptable" condition, many parts were found to be in "deficient" or "poor" condition. *Id.* at 69-72. For example:

- The crest of the Dam, which had two homes built "in/on [the D]am[,]" was in "poor" condition. *Id.* at 69.

- The downstream slope of the Dam was found to be deficient because there appeared to be a few crayfish or crawdad burrows that "if interconnected, could present a problem in a high water seepage situation." *Id.* at 70.

---

[3] A "spillway" is "a passage for surplus water to run over or around an obstruction (such as a dam)[.]" MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/spillway [https://perma.cc/H87U-R527].

[4] It is unclear from the record whether the Association asked DNR to perform the repairs or DNR undertook the repairs based upon the findings of the 2009 inspection report.

[5] It is unclear from the record when DNR began these repairs.

- The principal and auxiliary spillways were found to be deficient due to deterioration and inadequate freeboard[6] between the lake and the top of the Dam.

[7]     DNR recommended the following to improve the safety of the Dam:

- Clear trees and/or brush from the entire Dam and within twenty-five feet of all concrete structures.

- Employ an experienced engineer to (among other things) prepare plans and specifications for an adequate spillway "[f]or overtopping protection" and "evaluate the need for current dam design standards and recommended repairs."

- Develop a maintenance plan to address "voids under the primary spillway" and the "erosion and deterioration at the end of the primary spillway apron" within the next two years.

- Develop studies and plans to address the inadequate spillway system, and, "[a]t a minimum," remove the two homes built into the embankment between the spillways.

*Id.* at 71.

---

[6] "Freeboard" is defined as "[t]he distance between [the] normal water level and the top of a structure or mass that rises out of the water, such as a buoy, dam, or ice floe." THE FREE DICTIONARY.COM, http://www.thefreedictionary.com/freeboard [https://perma.cc/3526-BTZ5].

DNR also recommended reclassifying the Dam from a "significant hazard" dam to a "high hazard" dam.[7] *Id.* at 72. DNR made this recommendation based on modeling tools and emergency planning exercises that showed that "multiple residential and business structures [were] at high risk" in the event of a "catastrophic breach of the [D]am." *Id.*

Regarding whether previously recommended maintenance, repairs, and upgrades to the Dam had been performed, DNR checked both the "yes" and "no" boxes in the 2017 inspection report and then provided the following:

> The 2011-2012 project did not address *all* of the recommendations from the previous visual inspection. Part of the "all" would include removal of the 2 homes between the east and west spillways. The embankment is the responsibility of the Webster Lake Association. However, many items were addressed with the recent rehab.

*Id.* at 72 (emphasis added).

On August 27, 2018, the Association, by counsel, sent a letter to DNR demanding that DNR undertake the repairs identified in the 2017 inspection report in accordance with the 1996 Agreement. Specifically, the Association wrote:

---

[7] A "significant hazard" dam is one that "the failure of which may damage isolated homes and highways, or cause the temporary interruption of public utility services." Appellant's App., Vol. 2 at 74. A "high hazard" dam is one that "the failure of which may cause the loss of life and serious damage to homes, industrial and commercial buildings, public utilities, major highways, or railroads." *Id.*; Ind. Code § 14-27-7.5-8(b)(1).

It appears that a dispute has arisen in regard to the parties'
obligations under the 1996 Agreement. The [Dam] is in need of
significant repair and the DNR appears reluctant to perform its
obligations. In light of the significant issues with the structure
and the need for immediate attention, I have been directed by the
Association to contact you to obtain a position statement from
[DNR]. If a prompt response indicating that [DNR] will
undertake necessary repairs is not received, I have been directed
by the Association to file the enclosed complaint against [DNR]
asking the Court to enforce the 1996 Agreement.

*Id.* at 120. On September 5, DNR sent a response letter to the Association's
counsel rejecting the Association's demand and denying any obligation "to
address or fund the resolution or rehabilitation" of the Dam. *Id.* at 121. The
letter provides in relevant part:

DNR has strived to work in cooperation with the . . . Association
for the operation and maintenance of the lake outlet works, and
committed substantial staff time to assist the Association in
recruiting and training operators, as well as facilitating
emergency response planning activities. In fact, DNR staff were
participating with the Association in emergency response
training, on August 27th, 2018—the day you drafted and sent
your letter.

The [1996 A]greement is operationally focused and contains no
project commitments or obligations owing to DNR. In addition,
DNR is not obligated by the [1996 A]greement to address or fund
the resolution or rehabilitation of dam safety deficiencies that
develop as this *non-State owned dam structure* deteriorates with age.

*Id.*

On February 7, 2019, the Association filed a complaint against DNR, seeking a declaratory judgment regarding the obligations of DNR under the 1996 Agreement and requiring DNR "to undertake reconstruction and repair" of the Dam. *Id.* at 10. On March 1, DNR filed a motion to dismiss. After a hearing on the matter, the trial court directed the Association to amend its complaint. On April 1, the Association filed its amended complaint.

On May 13, DNR filed its answer to the amended complaint, raising the following affirmative defenses:

> 15. The Amended Complaint fails to state an actionable claim for relief under the Indiana Constitution.

> 16. The state agency is immune from liability under the terms of Indiana Code subsections 34-13-3-3(1), (2), (7) (11) and (21).

> 17. Further, [the Association] in this case has failed to show any action on their part to mitigate the need for any repairs.

> 18. Plaintiff failed to join parties necessary for a just adjudication.

> 19. Relief sought in this Amended Complaint is not appropriate for a declaratory judgment.

*Id.* at 125. DNR separately filed an Indiana Trial Rule 12(C) motion for judgment on the pleadings. On May 28, the Association filed a motion for judgment on the pleadings and a separate response to DNR's Trial Rule 12(C) motion, seeking a declaratory judgment.

A hearing on the cross-motions for judgment on the pleadings was held on July 18, 2019, during which the trial court heard arguments on the issues the parties raised in their respective motions and responses, as well as new arguments raised by DNR concerning whether the 1996 Agreement was a valid contract. DNR specifically argued that the 1996 Agreement lacked consideration and the DNR representative who executed the agreement lacked the authority to do so. The trial court noted that DNR did not raise these arguments in its motion for judgment on the pleadings but allowed DNR to continue presenting the arguments at the hearing. The Association maintained that the only issue before the court was whether a valid contract existed between the parties and asked the trial court for a declaratory judgment that the 1996 Agreement was valid.

At the conclusion of the hearing, the trial court directed the parties to file post-argument briefs addressing all of the arguments raised at the hearing. On August 27, the trial court issued its final order, which reads in relevant part:

> The [Association] argued for declaratory judgment at the hearing held July 18, 2019, indicating the only issue for the Court pending under the Amended Complaint is the validity of the [1996 Agreement] as a contract. The Court having considered the argument of counsel, having reviewed the Post-Argument Briefs, having reviewed the Court's file, and being duly advised in the premises, NOW FINDS that declaratory judgment should be entered in favor of the [Association].
>
> IT IS, THEREFORE, ORDERED AND DECLARED that the [1996] Agreement between [the Association] and [DNR] . . . is a valid and binding agreement/contract.

Appealed Order at 1-2. DNR now appeals.

# Discussion and Decision

## I. Standard of Review

DNR contends that the trial court erred by entering declaratory judgment in favor of the Association. Pursuant to the Indiana Uniform Declaratory Judgment Act (the "Act"), declaratory judgments have the "force and effect of a final judgment[,]" Ind. Code § 34-14-1-1, and are therefore reviewed in the same manner as other judgments. Because the proceedings before the trial court in this case were based on pleadings and briefs (that is, no evidentiary hearing was held), a de novo standard of review applies. *See Title Servs., LLC v. Womacks*, 848 N.E.2d 1151, 1154 (Ind. Ct. App. 2006) (applying de novo standard of review where trial court ruled based on a paper record). In applying the standard, the trial court's order should be affirmed on any legal theory the evidence of record supports. *See GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001).

## II. Declaratory Judgment

Declaratory judgments are governed by the Act, which in relevant part provides:

> Any person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or

franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ind. Code § 34-14-1-2. The Act is remedial, and its purpose is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered." Ind. Code § 34-14-1-12. Thus, the purpose of a declaratory judgment action is to quiet and stabilize legal relations and thereby provide a remedy in a case or controversy when there is still an opportunity for peaceable judicial settlement. *Volkswagenwerk, A.G. v. Watson*, 181 Ind. App. 155, 159, 390 N.E.2d 1082, 1084-85 (1979).

[17] When considering the appropriateness of declaratory judgment, the test to be applied is: (1) whether the issuance of a declaratory judgment will effectively solve the problem, (2) whether it will serve a useful purpose, and (3) whether or not another remedy is more effective or efficient. *Dible v. City of Lafayette*, 713 N.E.2d 269, 272 (Ind. 1999). "The determinative factor is whether the declaratory action will result in a just and more expeditious and economical determination of the entire controversy." *Id.* (quoting *Volkswagenwerk, A.G.*, 181 Ind. App. at 160, 390 N.E.2d at 1085). The use of a declaratory judgment is discretionary with the trial court and is usually unnecessary where a full and adequate remedy is already provided by another form of action. *Id.* However, pursuant to Indiana Trial Rule 57, "'[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.'" *Id.* (quoting Ind. Trial Rule 57).

DNR contends that the trial court's declaratory judgment in favor of the Association, determining that the 1996 Agreement is a valid contract, should be reversed for a number of reasons. First, DNR claims that the 1996 Agreement is not a valid contract because: (1) it was not supported by consideration, and (2) the director of the DNR's Division of Water, the signor of the 1996 Agreement, lacked authority to act on behalf of DNR. DNR also asserts that assuming the 1996 Agreement is a valid contract, DNR terminated the contract in 2018 when it denied any obligation to perform under the contract. We address each of DNR's arguments in turn.

## III. Validity of the 1996 Agreement

### A. Lack of Consideration

DNR claims that the 1996 Agreement is invalid because it lacks consideration. The Association correctly points out that failure of consideration must be specifically pled as an affirmative defense under Indiana Trial Rule 8(C).[8] The Association states, and DNR does not refute, that DNR did not raise the

---

[8] Indiana Trial Rule 8(C) reads in relevant part: "Affirmative defenses. A responsive pleading shall set forth affirmatively and carry the burden of proving: accord and satisfaction, arbitration and award, discharge in bankruptcy, duress, estoppel, *failure of consideration*, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, lack of jurisdiction over the subject-matter, lack of jurisdiction over the person, improper venue, insufficiency of process or service of process, the same action pending in another state court of this state, and any other matter constituting an avoidance, matter of abatement, or affirmative defense. A party required to affirmatively plead any matters . . . shall have the burden of proving such matters. . . ." (Emphasis added.)

affirmative defense of lack of consideration in its answer to the Association's amended complaint.

### *1. Waiver of Affirmative Defense*

[20] Generally, an affirmative defense must be submitted in a responsive pleading at the earliest possible opportunity. Ind. Trial Rule 8(C); *see City of South Bend v. Dollahan*, 918 N.E.2d 343, 349 (Ind. Ct. App. 2009) (observing that Trial Rule 8(C) "provides that a party seeking to raise an affirmative defense must specifically plead said defense in its responsive pleading"), *trans. denied*. "While [T.R.] 8(C) appears to impose an absolute duty to raise an affirmative defense in a responsive pleading, Indiana courts have modified the mandatory nature of the rule by interpreting it in conjunction with [T.R.] 15(B)[.]" *Elkhart Cty. Farm Bureau Co-op. Ass'n, Inc. v. Hochstetler*, 418 N.E.2d 280, 282 (Ind. Ct. App. 1981). Trial Rule 15(B) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

> Either party may timely demand strict adherence to the predetermined route (pleadings) or, if deviation is permitted, the time necessary to prepare to meet the new issue. But when the trial has ended without objection as to the course it took, the evidence then controls.

*Hochstetler*, 418 N.E.2d at 282 (quoting *Indianapolis Transit Sys., Inc. v. Williams*, 148 Ind. App. 649, 658, 269 N.E.2d 543, 550 (1971)).

While our courts have not expressly extended this modification to declaratory judgments, later decisions of this court have extended this to matters raised on summary judgment, and have identified the critical issue to be "'not whether the defendant could have raised his affirmative defense earlier,' but 'whether the defendant's failure to raise the affirmative defense earlier prejudiced the plaintiff.'" *Dollahan*, 918 N.E.2d at 350 (quoting *Borne by Borne v. Nw. Allen Cty. Sch. Corp.*, 532 N.E.2d 1196, 1199 (Ind. Ct. App. 1989), *trans. denied*.) "[A] plaintiff must affirmatively show prejudice to his case before [a belatedly raised affirmative defense] can be rejected." *Id.* (allowing city to assert governmental immunity defense first raised in its motion for summary judgment). We now examine whether the Association was prejudiced by DNR belatedly raising the lack of consideration defense.

DNR raised the affirmative defense of lack of consideration for the first time at the hearing held on July 18, 2019, where the trial court heard arguments on the parties' pleadings. The Association did not object when DNR raised the lack of consideration defense. Nevertheless, the trial court recognized that DNR was raising the defense for the first time; and, at the conclusion of the hearing, directed the parties to file post-argument briefs, thereby affording the Association a full and fair opportunity to address the defense. Furthermore, the Association has not shown how it was prejudiced by DNR's failure to affirmatively raise the defense in its answer to the Association's amended complaint. We, therefore, decline to find that DNR has waived the lack of

consideration issue. We now decide whether the 1996 Agreement was supported by consideration.

## *2. Consideration*

[23] As stated above, the 1996 Agreement provides that the Association

- "has the responsibility for the general maintenance of the outlet control structure to maintain, as near as possible, the legally established level of Webster Lake[;]"

- is required to operate the gates of the primary control structure so as to maintain the lake level of Webster Lake;

- must keep the secondary control structure closed, chained, and locked except in an emergency and with prior authorization from DNR;

- must provide the keys to the lock to DNR;

- is required to at least once annually and with the prior authorization from the DNR, open and close the gates of the secondary control structure to keep the gates from seizing;

- must keep on file with DNR "at all times a current roster of the names, addresses and phone numbers" of the designated operator of the Dam "and at least two alternate operators."

Appellant's App., Vol. 2 at 11. DNR has "[t]he responsibility for reconstruction or repair of the [Dam]." *Id.*

DNR argues that the 1996 Agreement was not valid because of lack of consideration. According to DNR, the 1996 Agreement "[i]s not supported by consideration because the Association only agreed to do what it was already obligated to do by law." Brief of Appellant at 12. In support of its argument, DNR turns our attention to the statutes governing the regulation of dams. DNR notes that under Indiana Code section 14-27-7.5-7, the Association, as the owner of the Dam, is required to "maintain and keep the structure in the state of repair and operating condition" required by "[t]he exercise of prudence[,]" "[d]ue regard for life and property[,]" and "[t]he application of sound and accepted technical principles." Indiana Code section 14-27-7.5-14 provides in relevant part that "[t]he owner of a structure shall . . . (3) Furnish upon request the plans, specifications, operating and maintenance data, or other information that is pertinent to the structure." Under Indiana Code section 14-27-7.5-8(a)(1)-(2), DNR has "jurisdiction and supervision over the maintenance and repair of structures in, on, or along the rivers, streams, and lakes of Indiana" and "shall exercise care to see that the structures are maintained in a good and sufficient state of repair and operating condition[.]"

Thus, DNR maintains that under the 1996 Agreement, the Association merely promised to perform pre-existing obligations. Because the Association owned the Dam, and "was already under a legal obligation to maintain and operate" the Dam and provide information as to who would operate the Dam, the Association's "promise to perform its pre-existing legal obligation was not valid consideration [and] the 1996 Agreement was merely an unenforceable

gratuitous act by DNR." Br. of Appellant at 13-14 (citation and internal quotations omitted). We disagree.

[26] The concept of consideration evolved from the law of contracts. *Monarch Beverage Co., Inc. v. Ind. Dep't of State Revenue*, 589 N.E.2d 1209, 1212 (Ind. Tax Ct. 1992). And in order to have a legally binding contract there must be generally an offer, acceptance, and consideration. *Id.* "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee." *Paint Shuttle, Inc. v. Cont'l Cas. Co.*, 733 N.E.2d 513, 523 (Ind. Ct. App. 2000) (quoting *A & S Corp. v. Midwest Commerce Banking Co.*, 525 N.E.2d 1290, 1292 (Ind. Ct. App. 1988)), *trans. denied*. A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled. *DiMizio v. Romo*, 756 N.E.2d 1018, 1023 (Ind. Ct. App. 2001), *trans. denied*. A detriment on the other hand is a legal right the promisee has forborne. *Id.* "The doing of an act by one at the request of another which may be a detrimental inconvenience, however slight, to the party doing it or may be a benefit, however slight, to the party at whose request it is performed, is legal consideration for a promise by such requesting party." *Harrison–Floyd Farm Bureau Co-op. Ass'n v. Reed*, 546 N.E.2d 855, 857 (Ind. Ct. App. 1989). In the end, "consideration—no matter what its form—consists of a bargained-for exchange." *Horseshoe Hammond. LLC v. Ind. Dep't of State Revenue,* 865 N.E.2d 725, 729 (Ind. Tax Ct. 2007), *trans. denied*. The adequacy of the consideration is not relevant. *See Harrison–Floyd Farm Bureau Co-op.*, 546 N.E.2d at 857.

"[I]t is fundamental that a contract is unenforceable if it fails to obligate the parties to do anything[.]" *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 559 (Ind. 1983). Long ago, our supreme court established that a promise to do what one "is already bound to do by law or by contract" is insufficient consideration. *Ritenour v. Mathews*, 42 Ind. 7, 14 (1873).

Under the 1996 Agreement, the Association not only agreed to maintain the Dam and maintain Webster Lake at its legal level, but agreed to do so in a very specific manner, that is, by opening and closing the primary gate, keeping the secondary gate locked (except for opening the gate once each year with prior authorization from DNR), and providing the keys to the lock to DNR. The Association also agreed to provide to DNR, "at all times[,]" contact information for the designated and the alternate operators of the Dam. Appellant's App., Vol. 2 at 11. In exchange, DNR agreed to reconstruct or repair the Dam. However slight the inconvenience or benefit, viewing the 1996 Agreement as a whole, we cannot say that the Association was not subjected to a detrimental inconvenience or that DNR did not receive a benefit of the bargain. Thus, the 1996 Agreement was not invalid on the basis of lack of consideration.

## B. Authority to Execute the Agreement

Next, DNR contends that the 1996 Agreement is not valid because the director of DNR's Division of Water ("Director Simpson") did not have the authority to execute the agreement on behalf of DNR. The Association counters that DNR's argument is waived because DNR (1) failed to affirmatively plead lack

of authority as a defense in its answer to the Association's amended complaint as required by Indiana Trial Rule 8(C); and (2) failed to properly deny the execution of the agreement pursuant to Indiana Trial Rule 9.2. We conclude that DNR's argument is not waived under either Trial Rule but find that the trial court properly presumed the execution of the agreement.

### 1. Waiver of Affirmative Defense

DNR seeks to invalidate the 1996 Agreement on the ground that Director Simpson lacked the authority to execute the agreement. As such, it seeks to avoid the agreement. A matter of avoidance must be specifically pled as an affirmative defense under Indiana Trial Rule 8(C). The Association asserts that DNR has waived the defense for failure to plead it affirmatively under Trial Rule 8(C). DNR maintains, however, that the defense is not waived because the Association has failed to show that it was prejudiced by the belated pleading of the defense. We agree with DNR.

As with the affirmative defense of lack of consideration, the trial court recognized that the lack of authority defense was not pled in DNR's answer to the Association's amended complaint but, nevertheless, allowed DNR to raise the argument at the hearing and then directed the parties to file post-argument briefs. The Association had the opportunity to respond to the defense and, thus, was not prejudiced by the late pleading of the defense. The lack of authority argument is not waived under Trial Rule 8(C).

## *2. Waiver Under Indiana Trial Rule 9.2*

[32]    Indiana Trial Rule 9.2 governs the pleading and proof of written instruments.  It

provides in relevant part:

> **(A)    When Instrument or Copy, or an Affidavit of Debt Shall
> be Filed.**  When any pleading allowed by these rules is founded
> on a written instrument, the original, or a copy thereof, shall be
> included in or filed with the pleading.  Such instrument, whether
> copied in the pleadings or not, shall be taken as part of the
> record. . . .
>
> **(B)   Proof of Execution of Instruments Filed with Pleadings.**
> When a pleading is founded on a written instrument and the
> instrument or a copy thereof is included in or filed with the
> pleading, *execution of such instrument, indorsement, or assignment
> shall be deemed to be established* and the instrument, if otherwise
> admissible, shall be deemed admitted into evidence in the action
> without proving its execution *unless execution be denied under oath
> in the responsive pleading or by an affidavit filed therewith*. . . .
>
> **(C)   Oath or Affidavit of Denial of Execution Must be Made
> Upon Personal Knowledge.**  An oath or affidavit denying
> execution as required and made under subdivision (B) of this rule
> shall be made upon the personal knowledge of the person making
> it, and, if general in form (Rule 11(B)), shall be deemed to be
> made upon such personal knowledge.
>
> **(D)  Burden of Proving Execution.**  The ultimate burden of
> proving the execution of a written instrument is upon the party
> claiming its validity, but *execution is presumed.  "Presumed" means
> that the trier of fact must find the existence of the fact presumed unless
> and until evidence is introduced which would support a finding of its
> nonexistence.*

* * *

**(F) Effect of Non-Compliance–Amendments.** Non-compliance with the provisions of this rule requiring a written instrument . . . to be included with the pleading may be raised by the first responsive pleading or prior motion of a party. The court, in its sound discretion, may order compliance, the reasons for non-compliance to be added to the pleadings, or allow the action to continue without further pleading. *Amendments to correct* the omission of a required written instrument, an assignment or indorsement thereof, [*or*] *the omission of a denial of the execution of a written instrument* as permitted or required by this rule, . . . shall be governed by Rule 15[.]

* * *

**(H) "Execution" of a Written Instrument.** "Execution" of a written instrument includes the following requirements:

(1) That a signature was made with express, implied or apparent authority and was not forged; . . . .

T.R. 9.2(A)-(H). Indiana Trial Rule 15 provides in relevant part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." T.R. 15(B).

[33] Trial Rule 9.2(B) permits the execution of written instruments, which are the foundation of a pleading but which may be used as evidence in the pleader's case, to be established and challenged at the pleading stage of a lawsuit. *Master Copy & Reprod. Ctr., Inc. v. Copyrite, Inc.*, 750 N.E.2d 824, 829 (Ind. Ct. App.

2001), *trans. denied*. The rule does not conclusively establish the genuineness of a signature. *See Moehlenkamp v. Shatz*, 396 N.E.2d 433, 438 (Ind. Ct. App. 1979). Rather, the purpose of the provision is to eliminate the technicalities of formally introducing into evidence matters that are not disputed by either party. *Master Copy & Reprod. Ctr., Inc.*, 750 N.E.2d at 830. While execution of a written instrument is presumed, the ultimate burden of proving execution is upon the party claiming its validity. T.R. 9.2(D). "'Presumed' means that the trier of fact must find the existence of the fact presumed unless and until evidence is introduced which would support a finding of its nonexistence." *Id.*

[34] Here, the Association's amended complaint is founded on a written instrument, and the Association complied with Trial Rule 9.2(A) by filing a copy of the 1996 Agreement with its amended complaint. *See Mechanics Laundry & Supply, Inc. v. Wilder Oil Co., Inc.*, 596 N.E.2d 248, 253 (Ind. Ct. App. 1992), *trans. denied*. Having done so, the agreement became a part of the record, and execution of the agreement was deemed established pursuant to Trial Rule 9.2(B). *See id.* Unless DNR denied execution of the 1996 Agreement under oath in a responsive pleading or by affidavit filed therewith, the agreement was deemed established without proving its execution. *See id.* Pursuant to Trial Rule 9.2(D), the trial court "must have presumed execution unless and until [DNR] introduced evidence supporting a finding otherwise." *See id.* However, DNR did not follow the pleading procedures set forth in Trial Rule 9.2(B), and its answer to the Association's amended complaint did not include a denial of

execution within the meaning of the rule. Thus, DNR's execution of the agreement was deemed "established." *See* T.R. 9.2(B).

[35] We note that DNR's failure to comply with the procedures under Trial Rule 9.2(B) would not have precluded the trial court from allowing DNR to present evidence that Director Simpson lacked the authority to execute the 1996 Agreement. *See, e.g., Master Copy & Reprod. Ctr., Inc.*, 750 N.E.2d at 831 (Appellant's failure to comply with Trial Rule 9.2(B) procedures did not preclude trial court from allowing Appellant to present evidence at trial that the altered agreement was a unilateral alteration). Absent a denial of execution under oath as described in Trial Rule 9.2(B), execution of the 1996 Agreement was simply presumed, and the agreement was deemed established without proof of execution by the Association. This presumption could still have been refuted by any evidence that DNR might have presented. *See id.* However, DNR presented no evidence to refute the presumption.

[36] Based on the foregoing, we decline to find that this issue is waived under Indiana Trial Rule 9.2. However, we conclude that we need not address whether Director Simpson had the authority to execute the 1996 Agreement because execution of the agreement was deemed established. The trial court properly presumed the agreement was deemed established, and the agreement is not invalid on the basis of lack of authority to execute the agreement.

# IV. Termination of the 1996 Agreement

[37] Finally, DNR contends that assuming the 1996 Agreement is a valid contract, the trial court still erred when it declared the agreement a valid and binding agreement. DNR maintains that the agreement required continuous performance without a time limit and, thus, could be terminated at will by either party. According to DNR, it exercised its right to terminate the agreement in 2018 when it sent its letter to the Association disclaiming any responsibility to perform under the agreement and because it did so, the agreement could not be declared valid and binding. The Association maintains that the agreement remains in effect and binding upon the parties.

[38] It is ordinary law that a contract containing no specific termination date is terminable at will and that where the parties fix no time for the performance or discharge of obligations created by the contract, they are assumed to have had in mind a reasonable time. *City of East Chicago, Ind. v. East Chicago Second Century, Inc.*, 908 N.E.2d 611, 623 (Ind. 2009); *House of Crane Inc. v. H. Fendrich, Inc.,* 146 Ind. App. 478, 482, 256 N.E.2d 578, 579 (1970). Here, however, we cannot say that the period of time from April 1996 to present is not a reasonable period of time for an agreement concerning the maintenance, reconstruction, and repair of a dam.

[39] Furthermore, we note that a party to an at-will contract cannot avoid its liability to the other party, once that party has performed, simply by terminating the contract. *See Wright Mfg. Corp. v. Scott*, 172 Ind. App. 154, 161, 360 N.E.2d 2, 7

(1977) (finding that under an agreement, Appellee was entitled to a 5% commission on orders he secured for Appellant before he was terminated by Appellant because "[Appellee], before he was terminated . . . , obtained from various customers blank purchase orders [that ran] through the [following] year[]"). Without deciding whether the Association performed as obligated under the agreement or DNR had an accrued liability under the agreement, we conclude that DNR did not terminate the agreement. The letter that DNR sent to the Association stated that "DNR is not obligated by the [1996 A]greement to address or fund the resolution or rehabilitation of dam safety deficiencies that develop as this *non-State owned dam structure* deteriorates with age." Appellant's App., Vol. 2 at 121. The letter challenged DNR's obligation under the agreement but did not express DNR's desire to terminate the agreement. The trial court did not err in declaring the 1996 Agreement a valid and binding agreement.

# Conclusion

[40] We conclude that DNR's arguments regarding the validity of the 1996 Agreement were not waived under either Indiana Trial Rules 8(C) or 9.2. The trial court properly determined that the agreement was supported by consideration, and properly presumed the agreement was deemed established. And, the agreement was not terminated by DNR. Thus, the trial court did not err in entering declaratory judgment in favor of the Association, declaring the 1996 Agreement to be a valid and binding agreement.

Affirmed.

May, J., and Vaidik, J., concur.